## BOYD et al. v. DUCKTOWN CHEMICAL & IRON CO. et al.

Eastern Section. June 15, 1935.

Petition for Certiorari denied by Supreme Court, January 11, 1936.

Charles B. Witt, of Benton, and R. R. Kramer, of Knoxville, for complainants.

D. Sullins Stuart, of Cleveland, and Miller, Miller & Martin, of Chattanooga, for defendants.

DeWITT, J.   Complainants, claiming as the heirs of John Davis (who died intestate about the year 1860), filed their original bill in ejectment on January 21, 1931, against Ducktown Chemical & Iron Company to recover one acre of land in Polk County, described

in the bill as "lying near the center of section 15, fractional township 4 south, range 5 east of the basis line, and being the same property John B. Davis reserved for cemetery purposes and on which the remains of John B. Davis rest," to restrain the mining, working, or removing any ores therefrom, and to recover the value of any materials already removed from said land.

On February 2, 1932, the complainants filed an amended and supplemental bill, averring that they had said acre of land surveyed and laid out as follows:

"John Davis, in the sale of Section 15, reserved to himself and his heirs for the use of a church and school and graveyard, one acre of land which lies in Section 15 and described to-wit:

"Beginning at a metal corner on the east side of the public road leading from Isabella to Copperhill; thence north 77 degrees and 38 Min. East, 187.5 feet to a stake corner on said side of the road and with line of fence of Cemetery; thence South 18 Degrees and 07 Min. East 233.4 feet to a stake corner; thence south 77 degrees and 07 Min. West 233.4 feet to the beginning corner, containing one acre.

"Said acre lies in the S. E. ¼ N. W. ¼ and the N. E. ¼ S. W. ¼ Section 15, Fractional Township 4 south Range 5 East, Ocoee District.

"The Cemetery embraced within the above boundary is fenced and is further designated and located by the graveyard in which John B. Davis's remains are resting, which is marked by a marble slab on which is inscribed the following, 'John B. Davis,' giving his *death* or birth, *death* all of which will be set forth by proof and said schoolhouse and church will be shown by proof from old citizens where it was and is located on this acre."

In September, 1894, the courthouse of Polk county was burned and the records in the register's office destroyed. The complainants produced, and the chancellor admitted as evidence, two abstracts of titles, known as the Seymour and Baker abstracts, showing a registered deed of John Davis of December 11, 1852, as follows:

"John Davis, grantor, grantees J. Caldwell, Thos. W. Mastin and Elias Davis, Commissioners for use of Township as public worship. Inst. D. G. W.  Date 1852, Dec. 11, Con. 1 cent. Ack't. 27 Oct. 1853. 1 A. R. E. T. Sec. which is embraced in the 40 which I sold to Nelson Carter and which acre was reserved by me.  For worship and education.  (On Margin) R 5 E., Frt. 4-S, Sec. 15.  N.E. of S. W. See D 201."

The abstracts also show that by deed dated June 18, 1846, John Davis acquired from William P. Lea, grantee from the state, the title to a tract of land, said to include the acre in question described as follows: "160 A. R. 5 E. Fr. T. 4 S. Sec. 15."  This of course means 160 acres in range 5 east fractional township 4 south section

15. The deed from John Davis to Nelson Carter was not shown. There is no evidence that John Davis had the title to any land in the north half of section 15 of township 4. In subsequent conveyances of 40 acres of the land acquired by Davis from Lea, recitals were made that one acre was reserved for a meeting house. On December 27, 1852, Nelson Carter conveyed to Elias Davis, a son of John Davis, 40 acres of this land, reciting, "one acre reserved embracing sch. H. or meeting H." In none of these conveyances is there any mention of a graveyard. The evidence shows that there is a graveyard in which John Davis and some of his family are buried, comprising .38 of an acre lying in the north half of section 15 just above the quarter section line between the northern and southern halves of section 15, with the exception that in the southwest corner of the fenced graveyard a small triangle laps over on the south half of section 15. Around and including this cemetery the complainants have sought to locate the one acre as the acre reserved, and to show that on this one acre but west of the cemetery there stood a building which was used for church and schoolhouse and which was destroyed many years ago. This acre has been run by their surveyors as 233.4 feet from east to west and 187.5 feet from north to south, and adjoining a public road on the west; the west line being the western fence of the graveyard. The evidence shows without dispute that for thirty-five years before the filing of the bill the defendant and its predecessors in title had kept this graveyard under fence to prevent the desecration of the graves.

Upon the hearing of this cause the complainants further amended their bill so as to allege that, if John Davis did not have paper title to the land in question and therefore his heirs did not acquire title by inheritance of such title from him, nevertheless they are the owners of the acre of land including the graveyard by virtue of actual, continuous, open, and adverse possession thereof for a period of more than twenty years.

In its answers the defendant denied this claim of adverse possession. Further defenses made and here insisted upon are as follows: Most of the acre is on land that John Davis never owned; even as to the small part that he once owned, the very evidence which complainants introduced to show title in John Davis also showed that he conveyed his title away. Complainants' claim to a reversion because of the abandonment of the acre for school and church purposes, is defeated because there is no provision for reverter in the deed (to Caldwell, Mastin, and Elias Davis) by which John Davis conveyed away his title. Complainants cannot identify the acre which they claim as being the same acre mentioned in their alleged title papers. Defendant and its predecessors in title have had open and notorious adverse possession, under registered color of title more than seven years, more than twenty years, and more than thirty years.

The chancellor sustained all of these defenses, so that he dismissed the bill.

1. As to that portion of the acre which lies in the north half of section 15, there is no evidence that John Davis ever owned it. As aforesaid, nearly all of the cemetery as inclosed lies in the north half. Consequently the complainants have no paper title to that part of the acre which lies in the north half of section 15.

2. As the deed from John Davis to Caldwell, Mastin and Elias Davis, commissioners, contained no provision for reverter to himself or his heirs in the event the land should cease to be used for worship and education—schoolhouse and church—although the proof shows that, if there ever was any schoolhouse or meeting-house on this acre, it has long ago disappeared, the complainants cannot base any claim to it, because their ancestors' title was wholly conveyed away. On November 21, 1853, John Davis conveyed to Henry Young forty acres in the northeastern part of the southwest quarter of the south half of section 15, save, according to the Seymour abstract, "1 A embracing meeting house," or, according to the Baker abstract, "excepting one acre where meeting house stands."

The paper title may be tested alone by the deed from John Davis to the commissioners. We deal with an instrument having no provision for forfeiture of title should the land cease to be used for the purposes for which it was conveyed. The complainants contend that it was so used; consequently, if this is true, the purposes were fulfilled. The condition was substantially complied with. It must be remembered that there is no mention of a cemetery or graveyard in the deeds.

It is well settled that a mere expression of a general purpose in such a conveyance is not construed to create a condition which would work a forfeiture for cessation of the use specified. "Such conditions, when relied on to work a forfeiture, must be created by express terms or clear implication, and are construed strictly." Ramsey v. R. Co., 3 Tenn. Ch., 170, 175. In Southwestern Presbyterian University v. City of Clarksville, 149 Tenn., 256, 282, 259 S. W., 550, this rule of construction was declared to be axiomatic, and in the opinion many cases applying this rule are discussed, including Murdock v. Mayor, etc., of City of Memphis, 7 Cold., 483. The precise question here involved was decided in Walker v. Shelby County School Board, 150 Tenn., 202, 263 S. W., 792, to the effect that a conveyance of land "for public school purposes" did not create a condition causing reversion on ceasing to use the land for such purposes. The same principle was applied in Nashville, C. & St. L. Railway v. Bell, 162 Tenn., 661, 30 S. W. (2d), 1026.

The case of Yarbrough v. Yarbrough, 151 Tenn., 221, 269 S. W., 36, is not in point, for the deed involved contained an express provision for forfeiture and reversion. Nor is Temple v. Ferguson,

110 Tenn., 84, 72 S. W., 455, 100 Am. St. Rep., 791, an analogous case, for it merely holds that a conveyance to a trustee for the separate use of a married woman vests the absolute title in her upon the death of her husband.

The complainants cannot be heard to claim that the deed of Davis to the commissioners is void for uncertainty of description. They must locate the acre in order to claim it. They aver that the acre which they describe in their amended bill is the acre which Davis thus conveyed. They are bound by this assertion; and, if the description is void, they can claim no other. If the exclusion of this acre in the other deeds from Davis is void for uncertainty, then the title to the whole of the tract conveyed passed out of Davis, for there was no exclusion of the acre. The proposition thus advanced can avail nothing to the complainants.

It will be noticed from the description in the deed of John Davis to Caldwell, Mastin, and Elias Davis, commissioners, that it purported to convey the one acre which was reserved by John Davis from the 40 acres which he sold to Nelson Carter. The deed of John Davis to Nelson Carter is not shown in the record. But on December 25, 1852, Nelson Carter executed a deed to Elias Davis to a tract of 40 acres in range 5 east fractional township 4, south section 15, "N.E. of S.W., beginning at W.O. near Davis Mill Creek run, th. with a marked line crossing a ridge to a B.O. and P.O. on Patrick Nash's line; th. N. 20 degrees East of the cor. of S. D. 40. The various courses to beg. 1 A. reserved embracing the present sch. h. or meeting h." This is taken from the Seymour abstract. In the description of this deed in the Baker abstract, it is recited that it conveys 40 acres, the N. E. corner of S. W. quarter of section 15 fractional township 4 S. range 5 east. No reservation of the acre appears to be in this description. These descriptions, coupled with the recital in the deed to the one acre, "R. 5 E. frt. 4-S., section 15 N. E. of S. W.," would indicate that the acre reserved was somewhere in this tract of 40 acres which is the northeast corner of the southwest quarter of section 15. Thus, inasmuch as it does not appear from the deeds just where the acre is located, if the description of the acre in the deed from John Davis is void for uncertainty of description, then the deed of John Davis to Nelson Carter and the deed from Nelson Carter to Elias Davis must have operated to pass title to the whole 40-acre tract. The complainants are not claiming as heirs of Elias Davis, but of John Davis, who was his father.

3. It is a settled rule of property, and has been repeatedly applied in Tennessee, that a deed to a tract of land conveys the title to all lands within the boundary described that are held by the grantor, and that the burden is on the one attacking the deed to prove that there is a superior outstanding title to the particular

tract in dispute. A deed of this character is regarded as investing the grantee with a legal title to all of the land included in its boundaries not shown to be held by a superior title. The rule is that the burden of establishing the existence and location of the excluded land is on the party claiming adversely to the deed; and, unless a description of the excluded land appears in the deed, there is prima facie no excluded territory until the evidence establishes the fact. Southern Iron & Coal Co. v. Schwoon, 124 Tenn., 176, 135 S. W., 785; Bowman v. Bowman, 3 Head, 47; Fowler v. Nixon, 7 Heisk., 719; Bleidorn v. Pilot Mountain, etc., Co., 89 Tenn., 166, 204, 15 S. W., 737; Brier Hill Collieries v. Gernt, 131 Tenn., 542, 543, 175 S. W., 560; Wright v. Hurst, 122 Tenn., 656, 127 S. W., 701; Briar Hill Colleries v. Pile, 4 Tenn. App., 468. Under the rule, the burden was upon the complainants to show the location of the excluded acre.

The complainants' witnesses are at much variance as to the location of this acre. The acre described in the amended bill is given by arbitrary boundaries. It includes the graveyard as fenced, although no graveyard or cemetery is described in any of the deeds. It appears that in 1906 the claim to this acre was made, although not in litigation, that it was situated west and southwest of the acre described in the amended bill. If it were so situated, it would not include the graveyard, and on that acre is a building known as the Mary Mine Store, which had been there for more than twenty years before the bill was filed. It appears further that this was the acre claimed up to the bringing of this suit. The complainants' witness Jory, 86 years of age, described the acre as including the land described in the amended bill in large part and extending so far west of it as to include the defendant's change house and inclined tramway, which had been on that land for more than twenty years before the bringing of this suit. The complainants sought to prove that just west of the cemetery but beyond the inclined tramway there once stood a church, and that this must have been the church mentioned in the deed of John Davis to the commissioners, because it was near the graveyard in which John Davis and some of his family are buried. Mr. Jory testified that he came there when a child and worked for a predecessor in title of the defendant, and that an old schoolhouse or meeting-house stood between the Mary Mine Store and the cemetery. If it did stand there, it is evident that it was not on the acre now claimed by the complainants; and it was separated from that acre by possessions maintained by the defendant for more than twenty years, that is the change house and the inclined tramway, known as the Gordon incline. Mr. Jory's testimony taken late in the taking of testimony, and at earlier dates certain witnesses for complainants undertook to locate the old meeting-house. W. R. Talley said that it stood north of the ceme-

tery. John R. Weaver said that it stood about 300 yards north of the cemetery. If either of these statements is true, John Davis never had any title to the land on which it was located, for it was not in the southwest quarter of section 15. Furthermore, if it was north of the cemetery, the defendant's Mary Mine office building and a large fenced inclosure around it have stood there since 1914 and 1915. If it was north of the cemetery, it did not stand on the acre which the complainants are claiming. This acre commences with the cemetery and runs southward.

It appears that about the year 1861 a very competent surveyor named Mueller made a map of this region, a copy of which is in the record. This map shows no schoolhouse or church on or close to the acre described in the amended bill, but it does show a schoolhouse in the northeast corner of the southwest quarter of section 15, on a hill about one-eighth of a mile west of the graveyard. The evidence shows that even this schoolhouse has long ago disappeared. It shows that Mueller himself lived on section 15 close to the property in question and it is fair to infer that he, was familiar with it. Mr. Jory remembered that a schoolhouse stood where Mueller's map shows, and that it was used both as a schoolhouse and a meeting-house. He admitted that the building which he located as having once stood between the cemetery and the Mary Mine Store was never used as a schoolhouse. He heard that it had once been used as a church. He first knew the property in 1857 or 1858. He said that the building which he mentioned was used in his time for a blacksmith shop. He merely had heard that it had been used as a church. He said that, when he first knew the building, its roof had fallen in and it was old and dilapidated, that it was fit only for animals. It appears that some years ago, when the claim to the acre had been brought up, the defendant company procured Mr. Jory and two other old men to go there and try to locate the site of the old church. Mr. Jory said that then there was no such building there; that he dug down and found a lot of ashes, from which he inferred that it was the site of the blacksmith shop which had once been the church. However, Mr. Lamoreaux, a long-time official of the defendant company, testified that these ashes had been placed there over the years out of the change house of the defendant company. The words "change house" appear to designate a house which the company maintains in which its miners and other employees get undressed, wash, and dress themselves; in other words, change their clothing as incident to their service in the copper mines.

The idea that a little family graveyard must necessarily be located close to a church is not at all conclusive. It is not a satisfactory inference. It is well known that there are thousands of family burying grounds in the country that are not located near any church or schoolhouse.

It is very likely that the church shown on Mueller's map in the southwest quarter of section 15 was located on the acre which was reserved by John Davis and that the church was used as a schoolhouse. Mueller's map was made only a few years after the date of the deed from John Davis to the commissioners. That acre has been in the adverse possession of the defendant and its predecessors in title for more than twenty years before the filing of the bill in this cause.

In view of all these facts, we are of the opinion that the chancellor was correct in holding that the acre which was reserved by John Davis and sought to be conveyed to the commissioners for a schoolhouse and meeting-house had not been definitely located, had not been at all clearly identified with the acre described in the amended bill.

4. As aforesaid, the complainants sought to prove title in themselves by adverse possession of the cemetery. In other words, they have taken the position that, even if they have no record title, they and their ancestors from whom they claim by inheritance have had adverse possession of this graveyard for about seventy-five years. Now there is no evidence whatever that they have exercised any physical possession of this graveyard, that they have kept it fenced, or that they have looked after the graves or tombstones. They introduced many witnesses whose testimony is to the effect that they have had possession because John Davis and others are buried there and his descendants have always claimed the graveyard. The proof shows conclusively that the defendant and its predecessors in title, mining corporations, have kept this graveyard fenced for more than thirty-five years in order that the graves might not be desecrated. This has been done on the theory of a moral and legal obligation. The defendant has for years taken minerals from under the graveyard. These witnesses for the complainants, some of them being complainants themselves, testified that they believed that they owned the graveyard. As aforesaid, they could not specify any act of physical possession on their part. They admitted finally that all that they meant by possession was that they believed that they owned it.

5. We now deal further with the claim of the complainants of title by adverse possession of the land included in the graveyard. There is no evidence that this land was ever granted or otherwise acquired or used for a public cemetery. It is a private graveyard which has been kept under a fence by the defendant in order to preserve it as such and to prevent the desecration of the graves. The defendant does not seek to interfere with the use of the land for this purpose. It has faithfully observed the prohibitions of chapter 63 of the Acts of 1857-58 (Code, sec. 10886) against trespass upon graveyards and the memorials of the dead.

In Hines v. State, 126 Tenn., 1, 149 S. W., 1058, 1059, 42 L. R. A. (N. S.), 1138, the right of descendants of a landowner who had set apart one acre as a family burial ground, to have a right or easement of burial therein and of ingress and egress, was sustained as against a stranger to the family who had acquired the land. The court declared:

"When land has been definitely appropriated to burial purposes, it cannot be conveyed or devised as other property, so as to interfere with the use and purposes to which it has been devoted. When once dedicated to burial purposes, and interments have there been made, the then owner holds the title to some extent in trust for the benefit of those entitled to burial in it, and the heir at law, devisee, or vendee takes the property subject to this trust. The right of burial extends to all the descendants of the owner who devoted the property to burial purposes, and they may exercise it when the necessity arises."

The court further held that burial lots, whether public or private, are not the subject of trade and commerce, that it is always presumed that they are not included in the sale of property which surrounds them, and that the right is not barred by the statute of limitations so long as the lot is kept inclosed, or, if uninclosed, so long as the monuments and gravestones marking the graves are to be found there, or other attention is given to the graves, so as to show and perpetuate the sacred object and purpose to which the land has been devoted; no possession of the living being required in such cases.

We interpret these doctrines as applying to the right of burial and maintenance of the place as a graveyard. This right in the complainants is fully recognized by the defendant. It is fairly clear that in the Hines Case the court treated this right as an easement, for it said:

"Those who purchase the property after it has been appropriated to burial purposes take it subject to the rights we have stated, without any express reservation in the will or deed under which they take. Such reservation is implied."

All these rules were thus stated in a case in which no mineral rights under the graveyard were involved, as they are in the case before us.

It is familiar law that an easement in land may be acquired by adverse possession for twenty years without color of title. The right of burial and maintenance of a family burial ground is nothing more than a right of limited use of the land, and it may properly be regarded as an easement. This is generally held as to the character of the estate or property of an owner in a burial lot in a public cemetery (Trefry v. Younger, 226 Mass., 5, 114 N. E., 1033; Nicolson v. Daffin, 142 Ga., 729, 83 S. E., 658, L. R. A., 1915E, 168; 116 Am. St. Rep., 578, cases cited in note; Page v.

Symonds, 63 N. H., 17, 56 Am. Rep., 481; Hook v. Joyce, 94 Ky., 450, 22 S. W., 651, 21 L. R. A., 96; Roanoke Cemetery Co. v. Goodwin, 101 Va., 605, 44 S. E., 769; McWhirter v. Newell, 200 Ill., 583, 66 N. E., 345; 5 R. C. L., 246); and no distinction can properly be made from this as to title by adverse possession for maintenance of a private family burying ground. It follows, of course, that such right or easement, may be acquired by adverse possession. Hook v. Joyce, 94 Ky., 450, 22 S. W., 651, 21 L. R. A., 96. It now exists in the complainants as heirs of John Davis, and it is respected by the defendant. Being limited to such rights in this graveyard, neither complainants nor their ancestors have acquired by adverse possession any title or right to other interests in the soil—no interest in the minerals underneath the graveyard. They have proceeded upon a mistaken conception that they owned the absolute fee in the soil. As to the rights which they do possess, there is no issue in this cause.

6. The foregoing conclusions are determinative against the right of the complainants to maintain their bill in this cause, for they could recover, if at all, only upon the strength of their own title, not upon any weakness in the title of the defendant. But the proof also shows that the defendant and its predecessors in title have had open notorious adverse possession of the acre sued for, subject only to the said easement, for more than twenty years, and under registered deeds. On this very acre, outside of the graveyard, they maintained stables for more than twenty years.

In the deed of Black and others to the Ducktown Sulphur, Copper & Iron Company, Limited, of January 11, 1892, the northeast part of the southwest quarter of section 15 was included, "reserving therefrom one acre occupied by the school or meeting house." The evidence shows without dispute that at the date of that deed there was no school or meeting-house on the acre sued for; so that the reservation did not apply to this acre. There are no reservations in the subsequent deeds under which the defendant claims title.

7. In fourteen assignments of error complainants are made of the exclusion of testimony offered by the complainants. This testimony is grouped as follows:

(a) Testimony excluded because the questions asked were leading questions. Every one of these questions suggested directly to the witness the answer which he was expected to give.

(b) Testimony excluded on the ground that it was hearsay.

This testimony referred to matters and things which occurred or existed and ended long before the witnesses were born. Much of it was offered as a part of family history, purporting to have been handed down from one generation to another. It did not relate to pedigree, but to the location of the acre, the location of the church, the claim of ownership to the graveyard.

██ ██ It is, indeed, an ancient rule that, in questions of bound-

aries, declarations of persons who are dead may be given in evidence as to the locations of corners and boundary lines. McCloud v. Mynatt, 2 Cold., 163. But the evidence offered does not amount to the definiteness required by this rule. The witnesses did not give the names of the declarants, but merely stated things as of general reputation. This was not sufficient to bring the testimony within the rule of admissibility in an action of ejectment. Family traditions may be admissible as to a boundary, but not to prove a title. Cline's Heirs v. Catron, 63 Va., 378.

Even if this evidence were admissible in this case, it would be too vague to alter the result. Were it all considered, it would be too weak and inconclusive to warrant a recovery by the complainants.

(c) Testimony excluded on the theory that it embodied mere conclusions or opinions of the witnesses.

The witness Boyd undertook to say that he thought that the graveyard was a part of the acre reserved by John Davis. Mr. Jory undertook to say that he and two others, after inquiry, came to the conclusion that the church house stood on a certain site near the graveyard. McKenzie, a surveyor, testified by what was manifestly guesswork as to certain locations on a map made by him. He also undertook to say, without any supporting facts, that in his opinion the graveyard is located in the southwest quarter of section 15. All this was mere opinion testimony and was plainly inadmissible.

(d) Testimony excluded which was offered to show that at various times the defendant or its predecessors in title disclaimed any interest in this acre including the graveyard. There is no evidence that any of the persons alleged to have said that this property belonged exclusively to the Davis heirs had any right or authority to disclaim title in such manner. There is no evidence that anything that they may have said caused the heirs of Davis to do anything to their injury or to alter their conduct. There is no evidence that any of these persons were corporate officers. One of them was merely a mine foreman, and the other was a superintendent of mining operations. Titles are not conveyed or abandoned in such manner. Furthermore, the acts or declarations sought to be shown might easily be interpreted as merely in harmony with a recognition of the right of burial and maintenance of the graveyard—recognition of the right in the surface—and no more.

It results that all of the assignments of error are overruled, and the decree dismissing the bill is affirmed. The costs of the appeal will be adjudged against the complainants and the surety on their appeal bond.

Faw, P. J., and Crownover, J., concur.