**STATE of Tennessee ex rel. COMMISSIONER OF TRANSPORTATION**

v.

**MEDICINE BIRD BLACK BEAR WHITE EAGLE, et al.**

Court of Appeals of Tennessee, at Nashville.

July 11, 2001.

Permission to Appeal Denied by Supreme Court Dec. 10, 2001.

Paul G. Summers, Attorney General and Reporter, and Michael Moore, Solicitor General, for appellant, State of Tennessee.

Virginia Lee Story, Franklin, TN, and John E. Herbison, Nashville, TN, for Tennessee Commission of Indian Affairs and Toye Heape, Executive Director of the Tennessee Commission of Indian Affairs.

Joe W. McCaleb, Hendersonville, TN, for appellees, Medicine Bird Black Bear White Eagle, Albert Bender, Leela Vaughn, Rogers Clinch, Grady Jones, Michael Simms, Norman Totten, Sheila Totten, Edna Faye, Dale Mitchell, Robin Lockwood, and Anita Stevens.

Joseph H. Johnston, Nashville, TN, for appellees, Gilbert Cupp, Dan Kirby, and Marion Dunn.

## OPINION

KOCH, J., delivered the opinion of the court, in which CANTRELL, P.J., M.S. and CAIN, J., joined.

This appeal involves the efforts of the Tennessee Department of Transportation to widen the intersection of Hillsboro Road and Old Hickory Boulevard in Williamson County. After the discovery of two ancient graves near the intersection, the Department filed suit in the Chancery Court for Williamson County seeking permission to relocate the human remains found on the property and to discontinue the use of the property as a burial ground. Over the Department's objection, the trial court permitted the Tennessee Commission of Indian Affairs, its executive director, and fifteen individual Native Americans to intervene to oppose the relocation of the graves. After disqualifying the Attorney General and Reporter from representing the Commission, the trial court appointed two private lawyers to represent the Commission. We granted the Department's application for an ex-

traordinary appeal to determine (1) whether the Commission, its executive director, and the individual Native Americans meet the qualifications in Tenn.Code Ann. § 46–4–102 (2000) to participate in these proceedings as "interested persons," (2) whether the Attorney General and Reporter should have been disqualified from representing the Commission and its executive director, and, if so, (3) whether the trial court has authority to appoint private counsel to represent the Commission and its executive director. We have determined that neither the Commission, nor its executive director, nor the fifteen individual Native Americans meet the statutory requirements to participate as "interested persons" in these proceedings and that denying "interested person" status to the individual Native Americans does not interfere with their free exercise rights or rights of conscience guaranteed by U.S. Const. amend. I and Tenn. Const. art. I, § 3. We have also determined that the trial court erred by disqualifying the Attorney General and Reporter from representing the Commission and its executive director and by appointing private attorneys to represent the Commission. Accordingly, we reverse and vacate the trial court's orders and remand the case for further proceedings consistent with this opinion.

Hillsboro Road runs essentially north and south and connects the cities of Nashville and Franklin. Like many roads, it began as a pathway used by bears and buffalo looking for salt licks. Later, it became a main artery for Native Americans[1] in the area. Following statehood, the Tennessee General Assembly chartered it as a toll road. Eventually, Hillsboro Road was designated as a public road

---

1. According to the state archeologist, this area was on the fringe of areas claimed by the

Cherokee, Chickasaw, Shawnee, and Creek.

in 1902.[2] It has continued to be one of the principal links between Nashville and Franklin even after the construction of the interstate highways in Middle Tennessee.

During the last several decades of the twentieth century, Hillsboro Road became increasingly congested because of the significant population growth south of Nashville. By 1995, the intersection of Hillsboro Road and Old Hickory Boulevard was operating above capacity at peak hours. Accordingly, the Tennessee Department of Transportation began preparing plans to improve the intersection and also began acquiring the property needed for the planned improvements. One of these tracts, owned by the Kelly family, is located on the southeast side of Hillsboro Road where it intersects Old Hickory Boulevard near the boundary between Davidson and Williamson Counties.

The area in the general vicinity of the project was known to have Native American artifacts. Accordingly, the Department began a preliminary archeological examination of the Kelly tract even before the condemnation proceedings were completed. In October 1998, an archeological crew discovered several Native American artifacts of varying ages in the southeast corner of the proposed right-of-way. In late January 1999, after construction had commenced, the Department's archeological crew discovered an unmarked, ancient Native American grave in a portion of the project located in Williamson County. The Department's crew left the grave undisturbed and, as required by law, notified the State Archeologist of its discovery.

Shortly after the discovery of the first grave, a second unmarked, ancient Native American grave was discovered on the Williamson County portion of the project. This discovery prompted a meeting at the construction site to determine how to proceed. The participants in this meeting included representatives of the Department, representatives of the contractor and its subcontractors, and Toye Heape, the executive director of the Tennessee Commission of Indian Affairs ("Commission"). The representatives of the Department and the contractor determined that construction of the improvements could proceed because it would not disturb the two graves.

During the next month, the Department completed its acquisition of the Kelly tract.[3] The Department's surveyors also determined that the grave sites were actually five to six feet nearer to the proposed roadway than had been previously thought. The surveyors and engineers also concluded that even though the graves would not be paved over when Hillsboro Road was widened, they would be disturbed by the necessary construction of a slope next to the road and the installation of utilities and a water drainage pipe. On May 4, 1999, the Department filed a petition in the Chancery Court for Williamson County seeking to relocate the two graves and to terminate the use of the property as a cemetery in accordance with Tenn.Code Ann. §§ 46–4–101 to –104 (2000). In late May 1999, a third grave was discovered on a portion of the Kelly tract in Davidson County.[4]

---

2. Walter Stokes, Jr., *Hillsboro Pike and Something Personal*, Tenn. Hist. Q., Spring 1965, at 70–71, 84.

3. The Circuit Court for Davidson County signed the order of possession on March 31, 1999.

4. The Department thereafter filed a petition in the Chancery Court for Davidson County similar to the petition it filed in the Chancery Court for Williamson County seeking to terminate the use of the property as a cemetery. The Chancery Court for Davidson County later temporarily enjoined any further construc-

The trial court initially took up the Department's petition on June 2, 1999, but continued the hearing after Mr. Heape suggested that notice of the proceedings should be sent to fifty other Native American organizations. The Department provided the additional notice as directed by the trial court. When the hearing reconvened on June 14, 1999, the Commission and Mr. Heape, acting in his official capacity as the Commission's executive director, and fifteen individual Native Americans requested permission to join the suit as "interested persons" under Tenn.Code Ann. § 46–4–102. On June 17, 1999, the trial court entered an order, over the Department's objection, adding the Commission, Mr. Heape, and the fifteen individual Native Americans as "interested persons." The trial court also concluded that a "conflict of interest" existed between the Department and the Commission and set a hearing for June 25, 1999, to determine "whether the Attorney General can and should proceed as counsel in this case and whether independent counsel should and can be provided any state individual and or agency by appointment of the Governor, the Tennessee Supreme Court or otherwise."

Within days after the entry of the June 17, 1999 order, the Department filed a motion requesting reconsideration of the trial court's conclusion that the Commission and Mr. Heape, as well as the fifteen individual Native Americans, were "interested persons" under Tenn.Code Ann. § 46–4–102. The Department also filed an application for permission to pursue a

Tenn.R.App.P. 9 interlocutory appeal regarding the decision to accord "interested person" status to sixteen of the seventeen persons or entities included in the trial court's decision.[5] The trial court declined to act on the Department's motion or application at a June 28, 1999 hearing, but on June 29, 1999, entered a "supplemental order" expressly reaffirming the conclusions in its June 17, 1999 order that the Commission, Mr. Heape, and the fifteen individual Native Americans were "interested persons" for the purpose of Tenn. Code Ann. § 46–4–102.

On June 30, 1999, the trial court entered another order addressing the perceived "conflict of interest" between the Department and the Commission. Relying on its conclusion that the Commission and Mr. Heape were "interested persons" for the purpose of Tenn.Code Ann. § 46–4–102, the trial court determined that they were entitled to "independent, non-conflicted legal advice" and that the Office of the Attorney General could not provide this advice because it was statutorily obligated to represent the Department. Accordingly, the trial court appointed Virginia Lee Story, a lawyer practicing in Franklin, as " 'attorney general pro tem' or 'outside counsel' " to represent the Commission and Mr. Heape in this proceeding.[6]

On July 20, 1999, the Department filed an application for a Tenn.R.App.P. 10 extraordinary appeal with this court. On July 21, 1999, this court entered an order directing the Commission, Mr. Heape, and

---

tion of the project in Davidson County. *State ex rel. Comm'r of Transp. v. Any and All Parties With An Interest in the Property Identified as Tax Map 158, Parcel 34, Tax Assessor's Office, Davidson County, Tennessee,* No. 99–1278–III (Sept. 24, 1999).

**5.** The Department did not include the Commission in this application.

**6.** Ms. Story later requested additional assistance, and on July 20, 1999, the trial court entered another order appointing John E. Herbison of Nashville as "Second Chair" to assist Ms. Story in the trial and appellate courts.

the fifteen individual Native Americans to respond to the Department's application and staying all proceedings in the trial court. On July 22, 1999, the trial court filed an "Order to the Court of Appeals Requesting Remand and Lifting of Stay" to allow it to "reconsider" its June 29 and 30, 1999 orders and to act on the Department's Tenn.R.App.P. 9 application for an interlocutory appeal. On July 26, 1999, this court entered an order modifying its stay to permit the trial court to reconsider its conclusion that the Commission, Mr. Heape, and the fifteen individual Native Americans were "interested persons" under Tenn.Code Ann. § 46–4–102 and its decision to appoint an "attorney general pro tem" to represent the Commission and Mr. Heape.

The trial court conducted another hearing on August 5, 1999. During this hearing, the individual Native Americans introduced additional evidence regarding their status as "interested persons" under Tenn. Code Ann. § 46–4–102. They also presented evidence that representatives of the State had attempted to interfere with the religious ceremonies they were conducting at the construction site. On August 6, 1999, the trial court filed a lengthy order reaffirming its earlier decisions that the Commission, Mr. Heape, and the fifteen individual Native Americans were "interested persons" under Tenn.Code Ann. § 46–4–102 and appointing an "attorney general pro tem" to represent the Commission and Mr. Heape. The trial court also found that interfering with the religious ceremonies at the construction site was "totally inappropriate" and invited the individual Native Americans to apply to this court for permission to pursue an injunction pending appeal.[7]

On August 16, 1999, the Department filed with this court a renewed and amended application for a Tenn.R.App.P. 10 extraordinary appeal. The Department asserted that the trial court erred by concluding that the Commission, Mr. Heape, and the fifteen individual Native Americans were "interested persons" under Tenn.Code Ann. § 46–4–102 and that the trial court lacked authority to appoint an "attorney general pro tem" to represent the Commission and Mr. Heape. On August 27, 1999, this court granted the Department's application for an extraordinary appeal and directed the parties to address five issues.

## I.

### COMMON-LAW PROTECTION OF BURIAL GROUNDS

We deal here with a most sensitive matter. Disputes regarding burial and disinterment touch deep-seated human emotions and evoke strongly held personal and religious beliefs. Where once persons looked to religion or custom for resolution of these disputes, now they look to the law to provide the neutral principles for resolving among the living disputes involving the disposition of the dead and the rights surrounding their remains.

### A.

Since antiquity, most societies have held burial grounds in great reverence. *Memphis State Line R.R. v. Forest Hill Cemetery Co.*, 116 Tenn. 400, 418, 94 S.W. 69, 73 (1906) (observing that repositories of the dead are regarded with veneration); *see also In re Widening of Beekman Street*, 4 Bradf.Sur.R. 503, 522–23 (Sur.Ct. of N.Y. County 1856); *Mills v. Carolina Cemetery*

---

7. Neither the individual Native Americans nor the Commission have requested this court's permission to pursue such an injunction.

*Park Corp.*, 242 N.C. 20, 86 S.E.2d 893, 898 (1955). The early common law protected the sanctity of the grave by recognizing the "right" to a decent burial and the "right" to undisturbed repose. *Carney v. Smith*, 222 Tenn. 472, 475, 437 S.W.2d 246, 247 (1969); *Thompson v. State*, 105 Tenn. 177, 180, 58 S.W. 213, 213 (1900). Accordingly, unless a good and substantial reason existed, the common law strongly disfavored disturbing a body once it had been suitably buried. *Estes v. Woodlawn Mem'l Park, Inc.*, 780 S.W.2d 759, 763 (Tenn.Ct.App.1989); *Mallen v. Mallen*, 520 S.W.2d 736, 737 (Tenn.Ct.App.1974). In the words of Justice Cardozo, then a member of the New York Court of Appeals, "[t]he dead are to rest where they have been laid unless reason of substance is brought forward for disturbing their repose." *Yome v. Gorman*, 242 N.Y. 395, 152 N.E. 126, 129 (1926).

The right to undisturbed repose was not, however, absolute. *Mallen v. Mallen*, 520 S.W.2d at 737. The aphorism "Once a graveyard, always a graveyard" reflects custom only, not a rule of substantive law. *Trustees of First Presbyterian Church v. Alling*, 54 N.J.Super. 141, 148 A.2d 510, 514 (Ch.Div.1959); Percival E. Jackson, *The Law of Cadavers* 395 (2d ed. 1950) ("Jackson"). Thus, American common law recognized that human remains could be disinterred and reinterred elsewhere when their burial place is no longer under the care of the living or has lost its character as a burial ground. *Hines v. State*, 126 Tenn. 1, 6, 149 S.W. 1058, 1060 (1911); *Memphis State Line R.R. v. Forest Hill Cemetery*, 116 Tenn. at 419, 94 S.W. at 73–74; *Boyd v. Ducktown Chem. & Iron Co.*, 19 Tenn.App. 392, 401, 89 S.W.2d 360, 365–66 (1935). The relatives of persons buried in an abandoned burial ground had only the right to due notice and the right to a reasonable opportunity to move their relative's body to some other place of their own selection. If the relatives declined to take responsibility for moving the human remains, others could see to it that the remains were disinterred and reinterred in a decent manner. *Dutto v. Forest Hill Cemetery*, 8 Tenn.C.C.A. (Higgins) 120, 133 (1917) (quoting *Bessemer Land & Improvement Co. v. Jenkins*, 111 Ala. 135, 18 So. 565 (1895)).

The common law permitted the disinterment of human remains when the demands of the living outweighed the right of undisturbed repose. Henry Y. Bernard, *The Law of Death and Disposal of the Dead* 4 (2d ed. 1979) ("Bernard"); Jackson, at 111. Accordingly, the common law did not place burial grounds beyond the power of eminent domain. *United States v. Unknown Heirs of All Persons Buried in Post Oak Mission Cemetery*, 152 F.Supp. 452, 453 (W.D.Okla.1957) (authorizing the reinterment of the widow and children of the last chief of the Comanche Indians); *In re Widening of Beekman Street*, 4 Bradf. Sur.R. at 503; Bernard, at 4; Jackson, at 404; C.J. Polson, et al., *The Disposal of the Dead* 205–06 (1953) ("Polson"). The Tennessee Supreme Court recognized this principle approximately one hundred years ago but, in the absence of a statute, limited the power of eminent domain to abandoned burial grounds. Justice Neil stated:

> True it is the dead must give place to the living. In process of time their sepulchers are made the seats of cities, and are traversed by streets, and daily trodden by the feet of man. This is inevitable in the course of ages. But while these places are yet within the memory and under the active care of the living, while they are still devoted to pious uses, they are sacred, and we cannot suppose that the Legislature intended that they should be violated, in the absence of special provisions upon the subject, authorizing such invasion, and indi-

cating a method for the disinterment, removal, and reinterment of the bodies buried, and directing how the expense thereof shall be borne.

*Memphis State Line R.R. v. Forest Hill Cemetery Co.*, 116 Tenn. at 419, 94 S.W. at 73–74.

### B.

Prehistoric humans showed indifference to the dead by abandoning their bodies where they died. Polson, at 3. As time passed, the fear of death, the belief in life after death, and the unclean nature of dead bodies began to shape human burial practices. Superstition and religion played a significant role. Sir James G. Frazier, *The Golden Bough*, preface vii (1 vol. abridged ed.1996); Polson, at 4–5; Note, *Criminal Law—Right to Autopsy in Murder Prosecutions*, 24 Tenn.L.Rev. 385, 385 (1956). The first active burials amounted to placing a pile of stones over the body or placing the body in a cave when one was available. These practices were later replaced by burial in the earth which has continued to be the principal method of disposing of human remains throughout the world. Polson, at 3.

In pre-Christian England, the dead were buried far from towns and cities. With the arrival of Christianity came the custom of burial in and around church buildings. Prominent persons were buried in the churches themselves. Eventually, every person in England, except executed felons, heretics, and persons who took their own lives, had a right to be buried in the consecrated ground of a parish churchyard. *In re Widening of Beekman Street*, 4 Bradf.Sur.R. at 518; Jackson, at 12–13, 24, 57–58.

Between the sixth and thirteenth centuries, as the custom of burial in churchyards became more widespread, the church's ecclesiastical courts gradually extracted jurisdiction over all matters relating to burial from the common-law courts. Eventually, the ecclesiastical courts exercised exclusive temporal jurisdiction over these matters. *In re Widening of Beekman Street*, 4 Bradf.Sur.R. at 518; Jackson, at 22. Disinterring human remains without lawful authority was a common-law misdemeanor and was also an ecclesiastical offense. Polson, at 187. For human remains buried in consecrated ground, permission to disinter could be obtained only from the bishop of the diocese having jurisdiction over the burial ground and then only if the remains were to be reinterred in consecrated ground. For human remains not buried in consecrated ground, permission had to be obtained from the coroner, and the coroner granted permission only for the purpose of conducting an inquest. The ecclesiastical courts' jurisdiction did not begin to wane until Parliament enacted the Burial Acts of 1855 which invested the Crown's Principle Secretaries of State with authority over human remains buried in unconsecrated ground and any other exhumation for purposes other than reburial in consecrated ground. *Polson*, at 187–205; *see also* Anne R. Schiff, *Arising From the Dead: Challenges to Posthumous Procreation*, 75 N.C.L.Rev. 901, 923 (1997).

Many of the English burial customs found their way to America. Even though the colonists did not have the same right to be buried in a churchyard that their counterparts in England had, interment in churchyards was the most common mode of burial, followed by family burial grounds and, later, public cemeteries. Jackson, at 14. The states did not incorporate the English ecclesiastical law when they incorporated the common law. *In re Marriage of Anonymous Wife v. Anonymous Husband*, 153 Ariz. 573, 739 P.2d 794, 796 (1987); *State v. One 1990 Honda Accord*,

154 N.J. 373, 712 A.2d 1148, 1150 (1998); *In re Donn,* 14 N.Y.S. 189, 190 (1891); *Brewer v. Brewer,* 242 S.C. 9, 129 S.E.2d 736, 744 (1963); *Whitehair v. Highland Memory Gardens, Inc.,* 174 W.Va. 458, 327 S.E.2d 438, 441 (1985). Similarly, the American states, reflecting their belief of the importance of the separation of church and state, did not establish ecclesiastical courts. *Du Pont v. Du Pont,* 85 A.2d 724, 733 (Del.1951); *Bogert v. City of Indianapolis,* 13 Ind. 134, 140 (1859); Bernard, at 14.

One of the earliest and most authoritative decisions confirming that the civil secular courts in America had jurisdiction to resolve disputes involving burial and reinterment involved the City of New York's decision to widen Beekman Street. To complete this project, the city condemned a portion of the cemetery located in the churchyard of the Brick Presbyterian Church, thereby requiring the relocation of the graves of one hundred persons buried in the cemetery "to give place to the cartways and foot-walks of Beekman street." *In re Widening of Beekman Street,* 4 Bradf.Sur.R. at 507. The city paid the church $28,000 for the property, but a dispute arose between the church and the descendants of the persons buried in the cemetery regarding the disposition of the funds and the church's plans to reinter the remains in a common grave. One of the parties was the daughter of Moses Sherwood, who had been buried in the cemetery in 1801, who insisted that she and the other members of Mr. Sherwood's family had the right to require the church to reinter Mr. Sherwood in a separate grave with the separate monument that had been erected on his grave in the church cemetery.

The Supreme Court of New York appointed Samuel B. Ruggles to serve as referee to resolve the dispute. Mr. Ruggles's report has become a cornerstone of the development of the common law of burial in the United States. Arthur L.H. Street, *Street's Mortuary Jurisprudence* § 184, at 96 (1948); Bernard, at 14–15; William Boulier, *Sperm, Spleens and Other Valuables: the Need to Recognize Property Rights in Human Body Parts,* 23 Hofstra L.Rev. 693, 707 (1995); Diana D. Thomas, *Indian Burial Issues: Preservation or Desecration,* 59 U.M.K.C.L.Rev. 737, 748 (1991). One of the Ruggles Report's essential conclusions is that the secular American courts have jurisdiction over disputes involving the disposition of the dead and the rights surrounding their remains. *In re Widening of Beekman Street,* 4 Bradf.Sur.R. at 526.[8] The Special Term of the Supreme Court confirmed the Ruggles Report in April 1856 and directed the church to pay Mr. Sherwood's daughter $100 to reinter his remains in a separate grave and to re-erect his monument. The court also directed the church to separately reinter any other human remains whenever identified by the next of kin.

---

8. Specifically, the report states:

It certainly is not for us to interfere with the ecclesiastical law of England, nor needlessly to criticize its claims to the respect of the people whom it binds. We only ask to banish its maxims, doctrines, and practices from our jurisprudence, and to prevent them from guiding, in any way, our judicial action. The fungous excrescence which required centuries for its growth, may need an efflux of ages to remove. Burial, in the British Islands, may possibly remain, for many generations, subject exclusively to "ecclesiastical cognizance;" but in the new, transplanted England of the Western continent, the dead will find protection, if at all, in the secular tribunals, succeeding, by fair inheritance, to the primeval authority of the ancient, uncorrupted common law.

*In re Widening of Beekman Street,* 4 Bradf. Sur.R. at 526.

In this country today, the civil courts have unquestioned jurisdiction to resolve disputes involving the burial and reinterment of human remains. *Wolf v. Rose Hill Cemetery Ass'n,* 832 P.2d 1007, 1008 (Colo.Ct.App.1991); *Louisville & Nashville R.R. v. Wilson,* 123 Ga. 62, 51 S.E. 24, 25–26 (1905); *Sherman v. Sherman,* 330 N.J.Super. 638, 750 A.2d 229, 233 (1999); *Whitehair v. Highland Memory Gardens, Inc.,* 327 S.E.2d at 441. It is now commonly said that human remains, after interment, are in the custody of the law, and are subject to the control and discretion of the courts applying equitable principles. *Estes v. Woodlawn Mem'l Park, Inc.,* 780 S.W.2d at 762–63; *see also In re Estate of Medlen,* 286 Ill.App.3d 860, 222 Ill.Dec. 220, 677 N.E.2d 33, 36 (1997); *Harris v. Borough of Fair Haven,* 317 N.J.Super. 226, 721 A.2d 758, 762 (1998).

 The courts must employ neutral legal principles to resolve disputes among the living involving the disposition of human remains. *Mallen v. Mallen,* 520 S.W.2d at 737. In the search for these principles, the courts should not close their eyes to the customs and necessities of civilizations in dealing with the dead and the sentiments connected with the decent care and disposal of human remains. *Mallen v. Mallen,* 520 S.W.2d at 737; *see also Louisville & Nashville R.R. v. Wilson,* 51 S.E. at 25; *Goldman v. Mollen,* 168 Va. 345, 191 S.E. 627, 632 (1937). However, while the courts should respect the rights of persons to freely exercise their religion, *Wolf v. Rose Hill Cemetery Ass'n,* 832 P.2d at 1009, they must not permit the civil law to be circumscribed or superceded by the canon law of any particular religion. *Mallen v. Mallen,* 520 S.W.2d at 737. Religious customs, laws, and beliefs regarding the disposition of human remains are to be considered only for the purpose of producing an equitable result. *Wolf v.*

*Rose Hill Cemetery Ass'n,* 914 P.2d 468, 472 (Colo.Ct.App.1995).

## II.

### STATUTES PERTAINING TO BURIAL GROUNDS

The common law is, of course, not the only source for the rules and procedures governing the burial, custody, and disposition of human remains. The Tennessee General Assembly, as the principal architect of this state's public policy, may, and in fact has, fashioned rules and procedures governing the termination of burial grounds in general and Native American burial grounds in particular.

### A.

Until approximately fifty years ago, the rules and principles governing burials and the disposition and reinterment of human remains were chiefly court-made. When the needs and convenience of the living required it, abandoned cemeteries could be closed and the human remains therein reinterred elsewhere. *See Hines v. State,* 126 Tenn. at 6, 149 S.W. at 1060; *Boyd v. Ducktown Chem. & Iron Co.,* 19 Tenn.App. at 401, 89 S.W.2d at 365–66. The power of eminent domain could be exercised to acquire land containing a burial ground, but the acquiring authority could not compel the closure of the burial ground and the reinterment of the remains unless the burial ground was abandoned. *Memphis State Line R.R. v. Forest Hill Cemetery,* 116 Tenn. at 419, 94 S.W. at 73–74. The common law did not give the relatives and descendants of persons buried in an abandoned burial ground the power to block reinterring the human remains in another location. Rather, it recognized that these persons had a right to timely notice of the plans to relocate the human remains and the right to make their own arrangements for the reinterment of the relative's remains at a place of their choosing. *Dutto*

*v. Forest Hill Cemetery,* 8 Tenn.C.C.A. at 133.

The late 1940's and early 1950's marked dramatic growth in the construction of roads in the nation and in Tennessee. In 1949, most likely to facilitate the construction of an expanded network of rural roads,[9] the General Assembly expanded the power of public authorities to condemn real property containing burial grounds, to relocate the human remains in the burial grounds, and to put the property to other uses.[10] As if in direct response to the Tennessee Supreme Court's *Memphis State Line R.R. v. Forest Hill Cemetery Co.* opinion, this bill specifically authorized the closure of burial grounds, required definite arrangements for the reinterment of the human remains in the burial grounds, and required prior court approval of the allocation of costs.

The General Assembly expanded the circumstances permitting the closure of a burial ground beyond those recognized by the common law. While the Tennessee Supreme Court had limited closure to abandoned burial grounds, the statute authorized closure and reinterment (1) when the burial ground was abandoned [Tenn.Code Ann. § 46–4–101(1) ], (2) when the burial ground was in a neglected or abandoned condition [Tenn.Code Ann. § 46–4–101(2) ], (3) when "conditions or activities about or near the burial ground ... render the further use of same ... inconsistent with due and proper reverence or respect for the memory of the dead" [Tenn.Code Ann.

§ 46–4–101(3) ], and (4) when the continued used of the property as a burial ground became "unsuitable" for any other reason [Tenn.Code Ann. § 46–4–101(3) ].

The statutory procedure devised by the General Assembly for closing a burial ground is straightforward. Any "interested person or persons" or any municipality or county in which the burial ground is situated may file suit in the chancery court sitting in the county where the burial ground is located. Tenn.Code Ann. § 46–4–103(a). The plaintiff or plaintiffs must name as defendants (a) "interested persons" who are not plaintiffs and (b) the owners of the land or of any right or interest in the land. Tenn.Code Ann. § 46–4–103(b). Following a hearing, the trial court "shall" grant the request to close the burial ground if the following four conditions are met:

(1) any one of the conditions specified in Tenn.Code Ann. § 46–4–101 exist;

(2) the property is unsuitable for use as a burial ground for any reason or the continued use of the property as a burial ground is inconsistent with due and proper reverence or respect for the memory of the dead;

(3) definite and suitable arrangements have been made or will be made for the reinterment of the human remains; and

(4) the removal and reinterment of the human remains will be "done with

---

9. The bill was a companion to the bill establishing the state rural road system and appropriating $22,000,000 for rural road construction. Act of Feb. 11, 1949, ch. 16, 1949 Tenn.Pub.Acts 91. The bills were introduced on the same day, received consecutive bill numbers, and shared sponsors. The bill relating to burial grounds passed the Senate on February 9, 1949; while the bill creating the rural road system passed the Senate on February 10, 1949. The bills were placed to-

gether on the calendar of the House of Representatives and were passed unanimously on February 11, 1949. The House of Representatives first passed the rural road bill and then passed the bill permitting the closure of burial grounds.

10. Act of February 11, 1949, ch. 15, 1949 Tenn.Pub.Acts 86, now codified at Tenn.Code Ann. §§ 46–4–101, –104 (2000).

due care and decency, and that suitable memorial or memorials will be erected at the place of reinterment." Tenn.Code Ann. § 46–4–104.[11]

## B.

In addition to these generally applicable statutes, the General Assembly of Tennessee, like the federal government and many other states, has also enacted statutes specifically governing the disposition of Native American human remains and funerary objects. These statutes were long-overdue responses to the common practice, over two centuries old, of digging up and removing the contents of Native American graves for reasons of profit and curiosity.[12] During this time, massive numbers of Native American human remains [13] were removed from their graves for storage or display by government agencies, museums, universities, and tourist attractions. The practice became so widespread that virtually every Native American tribe or group in the country was affected by the grave looting.

For decades, various Native American groups repeatedly sought the repatriation of these human remains and funerary objects without much success. John B. Win-

ski, Note, *There Are Skeletons in the Closet: The Repatriation of Native American Human Remains and Burial Objects*, 34 Ariz.L.Rev. 187, 189 (1992) ("Winski"). The Native Americans' efforts to protect and repatriate Native American human remains and funerary objects became galvanized in 1986 with the discovery that 18,500 Native American human remains were being warehoused in the Smithsonian Institution. Trope & Echo–Hawk, 24 Ariz. St. L.J. at 55. The Congress responded in 1989 with the enactment of the National Museum of the American Indian Act.[14] This Act required the Smithsonian Institution to catalogue the Native American human remains and funerary objects. It also provided for the return of these human remains and funerary objects at the request of a lineal descendent or culturally affiliated tribe. 20 U.S.C.A. § 80q–9(c).

In 1990, both the General Assembly of Tennessee and the Congress enacted additional statutes governing Native American human remains and funerary objects. First, the Tennessee General Assembly strengthened the State's protection of these artifacts.[15] This legislation added three Native American members to the Archeological Advisory Committee [Tenn. Code Ann. § 11–6–103(c)(4) (1999)] and

---

**11.** Tennessee's statutes are consistent with similar statutes in other states. Forty-one other states, excluding Alaska, Idaho, Maine, Massachusetts, Mississippi, Nebraska, Utah, and Wyoming, have enacted statutes permitting the closure of cemeteries and the reinterment of the human remains. Massachusetts is the only state that explicitly proscribes closing burial grounds and reinterring the human remains. All of the forty-one states allowing closure of a cemetery place a variety of conditions on the manner in which the reinterment is carried out. Thirty-five of the states require notice to the deceased person's family, relatives, heirs, or next of kin, and two of the thirty-five states with notice provisions permit notice to the deceased person's "friends." None of the thirty-five states requiring notice give the persons with notice an absolute right

to veto the closure of the burial ground and reinterment of the human remains.

**12.** H.R.Rep. No. 101–877, at 10, *reprinted in* 1990 U.S.C.C.A.N. 4367, 4369.

**13.** National estimates place the number between one hundred thousand and two million. Jack F. Trope & Walter R. Echo–Hawk, *The Native American Graves Protection and Repatriation Act: Background and Legislative History*, 24 Ariz. St. L.J. 35, 39, 42, 59–60 (1992) ("Trope & Echo–Hawk").

**14.** 20 U.S.C.A. §§ 80q–80q–15 (West 2000).

**15.** Act of Apr. 4, 1990, ch. 852, 1990 Tenn. Pub.Acts 390.

outlawed the display of Native American human remains except when used as evidence in judicial proceedings [Tenn.Code Ann. §§ 11–6–104(b), –117 (1999) ]. It also required prompt reporting of the discovery of human remains to the Department of Environment and Conservation [Tenn. Code Ann. § 11–6–107(d)(3) (1999) ] and gave Native Americans the right to be present during the excavation of Native American human remains [Tenn.Code Ann. § 11–6–116(a) ].[16]

Unlike statutes in other states giving Native Americans veto power over the disinterment of Native American remains, Tennessee's statutes envision that human remains and funerary objects may be removed and appropriately reinterred.[17] Tenn.Code Ann. § 11–6–107(d)(4) requires the State to take control of Native American human remains and that they be reinterred as provided in Tenn.Code Ann.

§ 11–6–119 (1999) or Tenn.Code Ann. §§ 46–4–101, –104. Tenn.Code Ann. § 11–6–116(c)[18] requires persons intending to close a burial ground containing Native American human remains to give ten days written notice to the State Archeologist and requires the State archeologist to promptly notify the Native American members of the Archeological Advisory Commission and the chair of the Commission of Indian Affairs.[19] Finally, Tenn. Code Ann. § 11–6–119 provides that Native American human remains and funerary objects "shall be properly reburied . . . in accordance with procedures formulated by the advisory council which are appropriate to Native American traditions."[20]

Seven months later, the 101st Congress enacted the Native American Graves Protection and Repatriation Act ("NAGPRA"). The National Museum of the American Indian Act had proved unsatisfactory be-

---

**16.** Tenn.Code Ann. § 11–6–116(b) empowered the Department of Conservation and Environment to promulgate regulations governing Native American representatives at excavation sites. In 1991, the Department promulgated a regulation providing that at least one Native American member of the Archeological Advisory Commission is entitled to be present during the removal, excavation or disinterment of Native American human remains. Tenn.Comp.R. & Regs. r. 0400–9–1–.05 (1999).

**17.** Every state has enacted statutes pertaining to ancient or historic human remains, including Native American remains. Only one state, Washington, prohibits relocation of ancient human remains altogether. Most states require notice to some government commission or agency such as a state museum, state archeologist or archeological society, the department of anthropology at a state university, or a Native American board or commission. Thirty-four of these states require some sort of governmental approval prior to relocating the human remains. Seventeen states require permission of the landowner. Five states, Idaho, Massachusetts, Minnesota, Missouri, and Oregon, give a Native American

tribe veto power over the removal and reinterment of the human remains.

**18.** The General Assembly added this provision in 1999. Act of May 28, 1999, ch. 509, 1999 Tenn.Pub.Acts 1146.

**19.** See also Tenn.Comp.R. & Regs. r. 0400–9–1–.04 (1999).

**20.** The Department has promulgated regulations intended to assure that Native American human remains are properly reinterred in accordance with "original and/or traditional customs." When documentation exists that specifies the original manner of burial, reburial must be carried out in the same manner. Tenn.Comp.R. & Regs. r. 0400–9–1–.01(1) (1999). When documentation does not exist, reburial must be done in subsurface grave pits at such a depth to prevent further disturbance, and the human remains must be placed directly into the soil. Tenn.Comp.R. & Regs. r. 0400–9–1.01(2). These reburial areas must be as close to the original burial area as possible, Tenn.Comp.R. & Regs. r. 0400–9–1–.02 (1999), and must be suitably recorded and demarcated. Tenn.Comp.R. & Regs. r. 0400–9–1–.02, –03.

cause it applied only to human remains and funerary objects held by the Smithsonian Institution.[21] NAGPRA expanded federal protection to cover human remains and items found on federal or tribal land and to items held by federally funded agencies and museums,[22] but does not apply to items found on private or state land, items held by museums that do not receive federal funds, or items purchased by a museum or archeologist in good faith.[23] Like the National Museum of the American Indian Act, NAGPRA requires the return of human remains and funerary objects to lineal decedents and to Native American tribes that the museum or government agency determine to be culturally affiliated.[24] If a museum or government agency has not established cultural affiliation with a particular Native American tribe, the tribe may still be entitled to the human remains and funerary objects if it proves by a preponderance of the evidence that it is culturally affiliated with the human remains or items.[25]

## III.

### INTERESTED PERSON STATUS UNDER STATE LAW

As its first issue, the Department asserts that the trial court erred by permitting fifteen individual Native Americans, the Tennessee Commission of Indian Affairs, and the executive director of the Tennessee Commission of Indian Affairs to intervene in the case as "interested parties" under Tenn.Code Ann. § 46–4–102. The Department argues that the trial court's interpretation of Tenn.Code Ann. § 46–4–102 is inconsistent with its plain meaning and with the interpretation of the statute by other courts.[26] We agree that the trial court has misconstrued the statute. However, even though none of the individual Native American parties qualify for mandatory or permissive intervention as "interested persons," the trial court could have appropriately granted a request to permit them to participate as amicus curiae.

The provisions for notice in the statutory procedures for closing a burial ground reflect the common law. In 1917, the Court of Civil Appeals, citing the Supreme Court of Alabama with approval, observed that the relatives of persons buried in an abandoned burial ground had a right to "due notice and an opportunity to remove the bodies to some other place of their own selection." *Dutto v. Forest Hill Cemetery*, 8 Tenn.C.C.A. at 133. Similarly, Tenn. Code Ann. § 4–4–103(b) requires that "all interested persons" and "the owner or owners of the land or of any right of reversion or other right or interest therein" be given notice of an action to close a burial ground by being named as defendants. Tenn.Code Ann. § 46–4–102 defines the term "interested persons" as:

**21.** Michelle Hibbert, Comment, *Galileos or Grave Robbers? Science, the Native American Graves Protection and Repatriation Act, and the First Amendment*, 23 Am.Indian L.Rev. 425, 429 (1998/1999) ("Hibbert").

**22.** 25 U.S.C.A. §§ 3001(4), 3002 (West Supp. 2000).

**23.** 25 U.S.C.A. § 3001(13).

**24.** 25 U.S.C.A. §§ 3005(a)(1), (5)(A) (West Supp.2000).

**25.** 25 U.S.C.A. §§ 3002(a)(2)(B), 3005(a)(4).

**26.** *JDN Dev. Co. v. Unknown Defendants*, No. 97–3529–II (Davidson Ch. Feb. 15, 1998); *State ex rel. Comm'r of Transp. v. Any and All Parties With an Interest in the Property Identified as Tax Map 158, Parcel 34, Tax Assessor's Office, Davidson County Tennessee*, No. 99–1278–II, at 6 (Davidson Ch. Sept. 24, 1999).

any and all persons who have any right or easement or other right in, or incident or appurtenant to, a burial ground as such, including the surviving spouse and children, or if no surviving spouse or children, the nearest relative or relatives by consanguinity of any one (1) or more deceased persons whose remains are buried in any burial ground.

The Native American parties seeking to intervene in this proceeding claim "interested person" status under Tenn.Code Ann. § 46–4–102. Accordingly, we must employ the neutral rules of statutory construction to determine whether Tenn.Code Ann. § 46–4–102 can be extended to apply to persons who claim no interest in the real property on which the burial ground is located and who cannot prove that they are relatives by consanguinity of any of the persons buried in the burial ground.

### A.

■ The search for the meaning of statutory language is a judicial function. *Roseman v. Roseman*, 890 S.W.2d 27, 29 (Tenn.1994); *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 601 (Tenn.Ct.App.1999). Statutory construction and the application of the statute to particular facts present legal questions. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn.1998); *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn.1997). Accordingly, appellate courts must review these matters de novo without according the trial court's interpretation of the statute any presumption of correctness. *Hill v. City of Germantown*, 31 S.W.3d 234, 237 (Tenn. 2000); *Lavin v. Jordon*, 16 S.W.3d 362, 364 (Tenn.2000).

■ The courts' role is to ascertain and give the fullest possible effect to the intention and purpose of the General Assembly as reflected in the statute's language. *Stewart v. State*, 33 S.W.3d 785,

790–91 (Tenn.2000); *Gleaves v. Checker Cab Transit Corp.*, 15 S.W.3d 799, 802 (Tenn.2000). We must take care to avoid construing a statute in a way that outstrips its intended scope, *SunTrust Bank v. Johnson*, 46 S.W.3d 216, 224 (Tenn.Ct.App. 2000), or that unduly restricts its intended purpose. *Allen v. City of Gatlinburg*, 36 S.W.3d 73, 75 (Tenn.2001); *Bryant v. Genco Stamping & Mfg. Co.*, 33 S.W.3d 761, 765 (Tenn.2000).

■ The traditional canons of statutory construction guide a court's inquiry into a statute's purpose and effect. Judicial construction of a statute will more likely hew to the General Assembly's expressed intent if the court approaches the statutory text believing that the General Assembly chose its words deliberately, *Tidwell v. Servomation–Willoughby Co.*, 483 S.W.2d 98, 100 (Tenn.1972); *Clark v. Crow*, 37 S.W.3d 919, 922 (Tenn.Ct.App.2000), and that the General Assembly meant what it said. *Worley v. Weigels, Inc.*, 919 S.W.2d 589, 593 (Tenn.1996); *BellSouth Telecomm., Inc. v. Greer*, 972 S.W.2d 663, 672 (Tenn.Ct.App.1997).

■ Accordingly, our search for a statute's purpose and effect should begin with the words of the statute. *Blankenship v. Estate of Bain*, 5 S.W.3d 647, 651 (Tenn.1999); *Neff v. Cherokee Ins. Co.*, 704 S.W.2d 1, 3 (Tenn.1986); *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d at 602. We must give the words used in the statute their natural and ordinary meaning unless their context requires otherwise. *State v. Fitz*, 19 S.W.3d 213, 216 (Tenn.2000); *State ex rel. Metropolitan Gov't v. Spicewood Creek Watershed Dist.*, 848 S.W.2d 60, 62 (Tenn.1993); *SunTrust Bank v. Johnson*, 46 S.W.3d at 224. In addition, because words are known by the company they keep, *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 694, 115 S.Ct.

2407, 2411, 132 L.Ed.2d 597 (1995), we must construe a statute's language in the context of the entire statute and in light of the statute's general purpose. *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000); *Lyons v. Rasar*, 872 S.W.2d 895, 897 (Tenn.1994); *SunTrust Bank v. Johnson*, 46 S.W.3d at 224.

### B.

The trial court's expansive interpretation of Tenn.Code Ann. § 46–4–102 results from its focus on the literal meaning of the phrase "any right" without considering the phrase in the context of the words surrounding it or in the context of the entire statutory scheme for terminating burial grounds. Of course, the phrase "any right," when considered in a vacuum, is expansive enough to encompass every sort of right—legal, contractual, moral, and constitutional. However, the General Assembly did not use the phrase in a vacuum, and thus we must consider the phrase in context.

When the General Assembly set out in 1949 to create a statutory procedure for terminating burial sites, it knew that the courts had recognized that persons owning an interest in the real property and the decedent's relatives have certain legally protected rights.[27] *King v. Elrod*, 196 Tenn. 378, 383, 268 S.W.2d 103, 105 (1953) (holding that "relatives of a deceased" are entitled to insist upon legal protection for any disturbance); *Dutto v. Forest Hill Cemetery*, 8 Tenn.C.C.A. at 132 (recognizing causes of action by the "family" and the "owner of the lot"). Accordingly, the General Assembly drafted Tenn.Code Ann. § 46–4–102 to assure that family members of the deceased persons buried in the burial ground and the persons who owned any sort of interest in the burial ground had notice of the termination proceedings.

█ The language chosen by the General Assembly to identify the family members entitled to notice of the termination proceeding is straightforward. Tenn.Code Ann. § 46–4–102 defines these persons as "the surviving spouse and children, or if no surviving spouse or children, the nearest relative or relatives by consanguinity"[28] of any of the persons interred in the burial ground. To define the persons entitled to notice because of their interest in the property, the General Assembly chose words traditionally associated with conveyances of real property.[29] The General Assembly defined these persons as "persons who have any right or easement or other right in, or incident or appurtenant to, a burial ground as such." The terms "inci-

---

27. The courts must presume that the General Assembly knows the existing state of the law when it enacts new legislation. *Blankenship v. Estate of Bain*, 5 S.W.3d at 651; *Still v. First Tennessee Bank, N.A.*, 900 S.W.2d 282, 285 (Tenn.1995).

28. The term "consanguinity" is a lay as well as a technical legal term. Bryan A. Garner, *A Dictionary of Modern Legal Usage* 204 (2d ed.1995). It connotes relationship by blood. *Tudor v. Southern Trust Co.*, 193 Tenn. 331, 334, 246 S.W.2d 33, 34 (1952); *State v. Dodd*, 871 S.W.2d 496, 497 (Tenn.Crim.App.1993).

29. One old text observes that "[t]he word 'appurtenances' which in former times at least was so generally employed in deeds and leases is derived from the word *apparentir* which is Norman French and means to belong to. Speaking broadly, the word means anything corporeal or incorporeal which is an incident of, and belongs to some other thing as principle. At a time when the construction of conveyances was of a more technical character than it is at present the word was considered of much greater importance than it is now and it was considered that in its absence from a leave or other conveyance a very restricted meaning should attach to the words of the description of the premises conveyed." 1 H.C. Underhill, *A Treatise on the Law of Landlord and Tenant* § 291, at 442–43 (1909).

dent" and "appurtenant" are essentially synonymous.[30] Rights, easements, and other interests are incident or appurtenant to real property when they are necessary to the full enjoyment of the real property itself. *Bain v. Doyle,* 849 P.2d 910, 912 (Colo.Ct.App.1993); *Pine v. Gibraltar Sav. Ass'n,* 519 S.W.2d 238, 241 (Tex.Civ.App. 1974).

The Tennessee General Assembly chose its words carefully when it enacted Tenn. Code Ann. § 46–4–102. Based on the common meaning of the words themselves, it is evident that the General Assembly desired to make sure that any person with any sort of legally recognized possessory or nonpossessory interest or expectancy in the real property where the burial ground was located, as well as the blood relatives of the deceased, would receive notice of the termination proceeding by being made a party defendant under Tenn.Code Ann. § 46–4–103(b).

■■■ Our interpretation of the language in Tenn.Code Ann. § 46–4–102 is confirmed when that statute is considered in light of related provisions in Tenn.Code Ann. § 46–4–103. The purpose of these statutory proceedings, according to Tenn. Code Ann. § 46–4–103(a)(2) is "[t]o terminate the use of, and all rights and easements ... incident or appurtenant to the ground as a burial ground." In addition, Tenn.Code Ann. § 46–4–103(b) reiterates that "the owner or owners of the land or of any right of reversion or other right or interest therein" must be made defendants if they are not already parties. These

provisions reinforce our conclusion that the "rights" and "interests" referred to in both Tenn.Code Ann. § 46–4–102 and Tenn. Code Ann. § 46–4–103 are limited to rights and interests in real property.

Later statutes specifically relating to Native American human remains and funerary objects reflect that the General Assembly's understanding of the scope of the term "interested persons" in Tenn.Code Ann. § 46–4–102 is the same as ours. The General Assembly was aware of the general statutes governing the closure of burial grounds when it enacted the 1990 statutes specifically governing the care and handling of Native American human remains.[31] Had Tenn.Code Ann. § 46–4–102 already afforded Native Americans "interested person" status in proceedings to close a burial ground, it would not have been necessary to enact elaborate and specific notice procedures to be followed upon the discovery of Native American human remains. However, the General Assembly understood that Native Americans could not be "interested persons" under Tenn. Code Ann. § 46–4–102 unless they could prove that they possessed an interest in the real property or that they were related by blood to a person buried in the burial ground. Accordingly, it enacted Tenn. Code Ann. § 11–6–116(c) requiring that timely notice of the discovery of Native American human remains be given to the Native American members of the Archeological Advisory Commission and the executive director of the Commission of Indian

---

**30.** *Von Rohr v. Neely,* 76 Cal.App.2d 713, 173 P.2d 828, 829 (1946); *Hoskins v. Chicago Park Dist.,* 311 Ill.App. 98, 35 N.E.2d 525, 530 (1941); *Halpin v. Poushter,* 59 N.Y.S.2d 338, 343 (1945); *Helme v. Guy,* 6 N.C. (2 Murph.) 341, 342 (1818); *Appeal of Fisher,* 355 Pa. 364, 49 A.2d 626, 628 (1946); *see also Black's Law Dictionary* 103 (6th ed.1990).

**31.** The courts presume that the General Assembly is aware of its prior enactments when it enacts legislation. *Washington v. Robertson County,* 29 S.W.3d 466, 473 (Tenn.2000); *State ex rel. Metro. Gov't v. Spicewood Creek Watershed Dist.,* 848 S.W.2d at 63; *Neff v. Cherokee Ins. Co.,* 704 S.W.2d at 4.

Affairs.[32]

The trial court's result-oriented exegesis of Tenn.Code Ann. § 46–4–102 is inconsistent with the most rudimentary principles of statutory construction. It cannot be supported by the plain language of the statute itself, and it unreasonably expands the scope of the phrase "interested persons" when Tenn.Code Ann. § 46–4–102 is considered in light of the statutory scheme for closing burial grounds and the related statutes governing the reinterment of Native American human remains. Adopting the trial court's expansive interpretation of "any right" in Tenn.Code Ann. § 46–4–102 would essentially permit any person able to articulate some sort of right or interest in a burial ground to claim "interested person" status in a proceeding to close a burial ground. The General Assembly could not have intended such a result.[33] Accordingly, we have determined that by enacting Tenn.Code Ann. § 46–4–102, the General Assembly intended to codify rather than discard[34] the common-law rule requiring that persons with any sort of ownership interest in a burial ground and the family of the deceased persons buried there were entitled to notice of proceedings to terminate the use of the real property as a burial ground.

■ Based on our interpretation of Tenn.Code Ann. § 46–4–102, neither the individual Native Americans seeking to intervene in this proceeding nor the executive director of the Commission of Indian Affairs, nor the Commission itself qualify as "interested persons" entitled to be made parties to this proceeding. By their own admission, they own no legally recognized interest of any sort in the property at the intersection of Hillsboro Road and Old Hickory Boulevard where the three ancient graves were discovered. Further, they have been unable, and in fact did not attempt, to prove that they are related by blood to any of the persons buried in these graves. Accordingly, the trial court erred when it gave these parties "interested person" status in the proceeding brought by the Department to remove and reinter these human remains.

## C.

■ Our inquiry regarding the role of the fifteen individual Native Americans in this proceeding is not completed, even though we have concluded that the trial court misconstrued Tenn.Code Ann. § 46–4–102 when it granted them "interested person" status. Had these individuals requested permission to appear as amicus curiae in this proceeding, the unique circumstances of this case would have provid-

---

**32.** The General Assembly could just as easily have amended the definition of "interested person" in Tenn.Code Ann. § 46–4–102 to include culturally affiliated Native American tribes, but it chose the notice procedure instead.

**33.** The courts presume that the General Assembly did not intend an absurdity, and thus the courts should avoid using their power to construe statutes to produce absurd results. *Barnett v. Barnett,* 27 S.W.3d 904, 908 (Tenn. 2000); *Fletcher v. State,* 951 S.W.2d 378, 382 (Tenn.1997); *Wachovia Bank of North Carolina, N.A. v. Johnson,* 26 S.W.3d 621, 627 (Tenn.Ct.App.2000).

**34.** Statutes in derogation of the common law are to be strictly construed, *Perry v. Sentry Ins. Co.,* 938 S.W.2d 404, 406 (Tenn.1996); *Cardwell v. Bechtol,* 724 S.W.2d 739, 744 (Tenn.1987), and should be confined to their express terms. *Worley v. Weigels, Inc.,* 919 S.W.2d at 593. Accordingly, unless the plain meaning of a statute requires otherwise, the courts will presume that the General Assembly did not intend to change existing law. *Jordan v. Baptist Three Rivers Hosp.,* 984 S.W.2d 593, 599 (Tenn.1999); *Stem v. Nashville Interurban Ry.,* 142 Tenn. 494, 503–04, 221 S.W. 192, 195 (1920).

ed the trial court a sound basis for granting their request.

■ The courts have inherent authority to appoint an amicus even in the absence of a rule or statute. *Martinez v. Capital Cities/ABC-WPVI*, 909 F.Supp. 283, 286 (E.D.Pa.1995); *James Square Nursing Home, Inc. v. Wing*, 897 F.Supp. 682, 683 n. 2 (N.D.N.Y.1995); *Mausolf v. Babbitt*, 158 F.R.D. 143, 148 (D.Minn. 1994), *rev'd on other grounds*, 85 F.3d 1295 (8th Cir.1996). The role of an amicus is to provide timely and useful information, *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir.1982); *Sciotto v. Marple Newtown Sch. Dist.*, 70 F.Supp.2d 553, 554 (E.D.Pa.1999), that will assist the court in reaching the proper resolution of the issues it is being called upon to decide. *Ferguson v. Paycheck*, 672 S.W.2d 746, 747 (Tenn.1984); *Vanderbilt Univ. v. Mitchell*, 162 Tenn. 217, 227, 36 S.W.2d 83, 86 (1931).

■ As a general matter, appointing an amicus is reserved for rare and unusual cases, *Ferguson v. Paycheck*, 672 S.W.2d at 747; *Mayhew v. Wilder*, 46 S.W.3d 760, 778–79 (Tenn.Ct.App.2001), that involve questions of general or public interest. *Russell v. Board of Plumbing Exam'rs*, 74 F.Supp.2d 349, 350–51 (S.D.N.Y.1999); *Ciba–Geigy Ltd., BASF A.G. v. Fish Peddler, Inc.*, 683 So.2d 522, 523 (Fla.Dist.Ct.App.1996); *In re Interests of M.B.*, 101 Wash.App. 425, 3 P.3d 780, 785 (2000). An amicus can assist the court by (1) providing adversarial presentations when neither side is represented, (2) providing an adversarial presentation when only one point of view is represented, (3) supplementing the efforts of counsel even when both sides are represented, and (4) drawing the court's attention to broader legal or policy implications that might otherwise escape the court's consideration. *Giammalvo v. Sunshine Mining Co.*, 644 A.2d 407, 409 (Del.1994).

■ Amicus curiae are drawn from the ranks of persons who care about the legal principles that apply in the suit before the court, *Atlantic Mut. Ins. Co. v. Northwest Airlines, Inc.*, 24 F.3d 958, 961 (7th Cir. 1994); *Russell v. Board of Plumbing Exam'rs*, 74 F.Supp.2d at 350, but who do not have the right to appear in the suit as a party. *Giammalvo v. Sunshine Mining Co.*, 644 A.2d at 410. They need not be completely disinterested in the outcome of the case. *Bryant v. Better Bus. Bureau of Greater Md.*, 923 F.Supp. 720, 728 (D.Md. 1996); *Concerned Area Residents for the Env't v. Southview Farm*, 834 F.Supp. 1410, 1413 (W.D.N.Y.1993).

■ Decisions to appoint an amicus are discretionary. *De Julio v. Georgia*, 127 F.Supp.2d 1274, 1284 (N.D.Ga.2001); *United States v. El–Gabrowny*, 844 F.Supp. 955, 957 n. 1 (S.D.N.Y.1994). Persons permitted to appear as an amicus do not become parties to the litigation. *Turnbull v. Fink*, 644 A.2d 1322, 1324 (Del.1994); *People v. P.H.*, 145 Ill.2d 209, 164 Ill.Dec. 137, 582 N.E.2d 700, 711 (1991); *In re Receivership of Harvard Pilgrim Health Care*, 434 Mass. 51, 746 N.E.2d 513, 518 (2001); *Commonwealth v. Cotto*, 708 A.2d 806, 808 n. 2 (Pa.Super.Ct.1998). An amicus may perform many different duties as long as it is serving the interests of the court rather than the interests of the parties. *Mayhew v. Wilder*, 46 S.W.3d at 779. Thus, the role of an amicus is flexible. *Wyatt v. Hanan*, 868 F.Supp. 1356, 1359 (M.D.Ala.1994).

■ Determining the extent of an amicus curiae's participation in a case is also a discretionary decision. *Russell v. Board of Plumbing Exam'rs*, 74 F.Supp.2d at 351; *Waste Management of Pa., Inc. v. City of York*, 162 F.R.D. 34, 36 (M.D.Pa. 1995). However, an amicus must not intrude on the rights of the parties. Accord-

ingly, courts considering whether to designate an amicus and the role the amicus should play should consider, among other things, (1) the nature of the litigation and the issues presented, (2) the nature of the person or organization seeking amicus status, (3) the role that the amicus has played in other cases and the manner in which it has carried out its role, (4) the objections of the parties, and (5) whether the person or organization seeking amicus status is manipulating this role as a substitute for intervention. *Wyatt v. Hanan,* 868 F.Supp. at 1359–60.

This case is one of those rare cases in which the participation of an amicus curiae could assist the court in properly resolving the issues before it. The closure of burial grounds in general and the treatment and disposition of Native American human remains and funerary objects are matters of general public interest and of great cultural significance to Native Americans. In these proceedings, no property owner or blood relative of the persons whose remains were discovered has been identified. Thus, the Department is currently the only party before the court. Granting a request from responsible and interested parties to participate as amicus will assure an adversarial presentation of whatever evidence there may be to rebut the Department's case for terminating the use of the real property as a burial ground. Accordingly, on remand, the trial court may exercise its discretion to permit an amicus to appear in the proceedings to assist the court in properly resolving the issues raised by the Department's petition.[35]

35. For reasons more fully discussed in Section V, neither the Tennessee Commission of Indian Affairs nor its executive director, acting in his official capacity, have the authority to participate in this case as amicus curiae.

36. Byron J. Rose, Comment, *A Judicial Dilemma: Indian Religion, Indian Land, and the*

## IV.

### INTERFERENCE WITH THE NATIVE AMERICANS' FREE EXERCISE RIGHTS

We now turn to the Native Americans' free exercise claims under the Religion Clauses of the First Amendment to the United States Constitution and Tenn. Const. art. I, § 3. These claims are essentially three-fold. First, the Native Americans insist that denying them status as "interested persons" in this litigation will interfere with their rights of conscience by preventing them from presenting their objections to the relocation of the Native American human remains in the only legal forum available to resolve disputes regarding the termination of burial grounds. Second, they assert that disinterring the human remains is fundamentally inconsistent with their religious beliefs. Third, they assert that the removal of the human remains from their present location will prevent them from conducting traditional religious services.

At the outset, we must acknowledge the long history of the mistreatment of Native Americans at the hands of European settlers and their governments. We are not unmindful of the removal of the eastern tribes that was pursued so vigorously and cruelly in the early nineteenth century.[36] These federal and state policies undermined the Native Americans' religion and way of life by removing them from their ancestral homelands that were their source of strength.[37] We are likewise aware that

*Religion Clauses,* 7 Va. J. Soc. Pol'y & L. 103, 111 (1999).

37. Rennard Strickland & William M. Strickland, *Beyond the Trail of Tears: One Hundred Fifty Years of Cherokee Survival, in Cherokee Removal: Before and After* 112, 113 (William L. Anderson ed.1991).

historically Native American human remains and funerary objects have not received the same consideration and respect generally accorded to human remains of other races and nationalities.[38] The widespread removal, retention, and display of Native American human remains and funerary objects has had a tremendous impact on Native Americans, causing them emotional trauma and spiritual distress.[39] For most of the twentieth century, the Native Americans have sought redress for this historical discrimination, dehumanization, and commodification of their human remains and funerary objects,[40] but their efforts did not begin to meet with success until the past two decades.

This litigation is not an appropriate vehicle for addressing these historical indignities. That sort of relief must be obtained from the Congress, the Tennessee General Assembly, and other legislative bodies. The responsibility of the courts is to resolve the concrete disputes between the parties using the principles of law provided by the state and federal constitutions, the General Assembly, and the common law. However, as we fashion a legally supported resolution of the disputes before us, we should take into consideration the evidence regarding the Native Americans' traditional religious beliefs and practices.

## A.

■ Both the United States Constitution and the Constitution of Tennessee protect an individual's free exercise rights and rights of conscience. The Religion Clauses of the First Amendment provide that the federal and state governments[41] "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Likewise, Tenn. Const. art. I, § 3 provides:

That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience; that no man can of right be compelled to attend, erect, or support any place of worship, or to maintain any minister against his consent; that no human authority can, in any case whatever, control or interfere with the rights of conscience; and that no preference shall ever be given, by law, to any religious establishment or mode of worship.

The protections afforded to Tennesseans' religious freedoms by the Constitution of Tennessee share the contours of the protections afforded by the Bill of Rights of the United States Constitution. Both provisions were written to acknowledge various liberties and to protect the free exercise of these liberties from government intrusion. *Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d 1, 12 (Tenn.2000). However, the Constitution of Tennessee may provide greater protection and may even protect rights that are not protected by the United States Constitution. *State v. Barnett*, 909 S.W.2d 423, 430 n. 6 (Tenn.1995); *Miller v. State*, 584 S.W.2d 758, 760 (Tenn.1979). Thus, differences between the language of provisions in the Constitution of Tennessee

---

**38.** *Kickapoo Traditional Tribe of Tex. v. Chacon*, 46 F.Supp.2d 644, 654 (W.D.Tex.1999); *Bonnichsen v. United States, Dep't of the Army*, 969 F.Supp. 628, 649 (D.Or.1997); Trope & Echo–Hawk, 24 Ariz. St. L.J. at 43.

**39.** *Winski*, 34 Ariz.L.Rev. at 188.

**40.** *Hibbert*, 23 Am.Indian L.Rev. at 434.

**41.** The First Amendment's Free Exercise and Establishment Clauses have been made applicable to the states by incorporation into the Fourteenth Amendment. *Everson v. Board of Educ.*, 330 U.S. 1, 8, 67 S.Ct. 504, 508, 91 L.Ed. 711 (1947); *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

and the United States Constitution may prompt Tennessee's courts to recognize substantial differences in the degree of protection that Tenn. Const. art. I, § 3 may provide. *Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d at 13; *Davis–Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 525 (Tenn. 1993); *State v. Marshall*, 859 S.W.2d 289, 294–95 (Tenn.1993).

The Tennessee Supreme Court has characterized Tenn. Const. art. I, § 3 as "practically synonymous" with the Religion Clauses in the First Amendment. *Carden v. Bland*, 199 Tenn. 665, 672, 288 S.W.2d 718, 721 (1956). More recently, however, the Court has noted that "practical synonymity does not necessarily correspond to coextensive expressions of liberty, even as to individual express guarantees under the constitution." *Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d at 14. Thus, we must determine whether Tenn. Const. art. I, § 3 provides different or greater protections for individual religious freedom than those provided in the Religion Clauses of the First Amendment.

The Tennessee Supreme Court has addressed this question on two occasions. In 1959, the Court stated that Tenn. Const. art. I, § 3 is "broader and more comprehensive in its guarantee of freedom of worship and freedom of conscience." *Carden v. Bland*, 199 Tenn. at 672, 288 S.W.2d at 721. Sixteen years later, the Court repeated without elaboration that Tenn. Const. art. I, § 3 "contains a substantially stronger guaranty of religious freedoms." *State ex rel. Swann v. Pack*, 527 S.W.2d 99, 107 (Tenn.1975). The conclusion that the protections in Tenn. Const. art. I, § 3 are substantially stronger than those in the First Amendment must rest on something more than the greater length and specificity of Tennessee's constitutional provision. *Planned Parenthood of Middle*

*Tenn. v. Sundquist*, 38 S.W.3d at 28 (Barker, J., dissenting in part).

While the Court has characterized Tenn. Const. art. I, § 3 as "substantially stronger" than the Religion Clauses in the First Amendment, it has not, as yet, explained directly how the degree of protection of religious liberties afforded by Tenn. Const. art. I, § 3 differs from the First Amendment's protections. The *Carden v. Bland* decision provides two reasons for concluding that the Court was referring to Tenn. Const. art. I, § 3's prohibition against governmental establishment of religion. First, the *Carden v. Bland* case involved an establishment challenge to a state statute requiring public school teachers to read a section from The Bible at the beginning of every school day. Second, the Court illustrated its conclusion that Tenn. Const. art. I, § 3 is "broader and more comprehensive" than the First Amendment by citing the following language: "no preference shall ever be given, by law, to any religious establishment or mode of worship." The Court's citation of this provision to the exclusion of Tenn. Const. art. I, § 3's free exercise provisions indicates that the Court had the establishment of religion in mind when it characterized Tenn. Const. art. I, § 3 as stronger than its federal counterpart.

■ The Tennessee Supreme Court has never held that Tenn. Const. art. I, § 3's protection of the right of conscience and free exercise of religion are more expansive than the Free Exercise Clause of the First Amendment. To the contrary, the Court has consistently construed and applied the free exercise protections in Tenn. Const. art. I, § 3 using the same principles employed by the United States Supreme Court to interpret the Free Exercise Clause of the First Amendment. Thus, for the purpose of this opinion, we conclude that the degree of protection that

Tenn. Const. art. I, § 3 provides for the religious freedoms of the Native Americans is the same as that provided by the Free Exercise Clause of the First Amendment.

## B.

■ Both the First Amendment and Tenn. Const. art. I, § 3 are the products of the historic struggle to balance the demands of the secular world of government and the conscience of individuals. *Girouard v. United States*, 328 U.S. 61, 68, 66 S.Ct. 826, 829, 90 L.Ed. 1084 (1946); *Wolf v. Sundquist*, 955 S.W.2d 626, 630 (Tenn. Ct.App.1997). In the United States, the federal and state courts maintain this constitutional equilibrium by recognizing that religious liberty embodies two complementary concepts. First and foremost, religious liberty includes the right to believe and to profess whatever religious doctrine one desires. *Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. 872, 877, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990). Second, it includes the right to act, or to refrain from acting, in a manner consistent with one's religious beliefs.

■ The federal and state constitutions place the freedom of belief (or rights of conscience) beyond government control or interference. Accordingly, under the Free Exercise Clause of the First Amendment and Tenn. Const. art. I, § 3 the freedom of belief is absolute and inviolate. *Bowen v. Roy*, 476 U.S. 693, 699, 106 S.Ct. 2147, 2152, 90 L.Ed.2d 735 (1986); *State ex rel. Swann v. Pack*, 527 S.W.2d at 107; *Goodwin v. Metropolitan Bd. of Health*, 656 S.W.2d 383, 389 (Tenn.Ct.App.1983). As Justice Jackson stated in another First Amendment context:

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.

*West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943).

■ On the other hand, laws are made to govern actions, and while they cannot interfere with religious beliefs and opinions, they may interfere with religiously motivated conduct. *Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. at 879, 110 S.Ct. at 1600; *Reynolds v. United States*, 98 U.S. 145, 166, 25 L.Ed. 244 (1878). Thus, the freedom to engage in religiously grounded conduct is not absolute. *Cantwell v. Connecticut*, 310 U.S. at 304, 60 S.Ct. at 903. Some religious acts and practices by individuals must yield to the common good. *Bowen v. Roy*, 476 U.S. at 702, 106 S.Ct. at 2153; *United States v. Lee*, 455 U.S. 252, 259, 102 S.Ct. 1051, 1056, 71 L.Ed.2d 127 (1982); *Wolf v. Sundquist*, 955 S.W.2d at 630.

■ The free exercise protections in the federal and state constitutions are intended to apply to the widest possible scope of religious conduct. Michael W. McConnell, *Free Exercise As the Framers Understood It*, in *The Bill of Rights: Original Meaning and Current Understanding* 54, 67 (Eugene W. Hickok, Jr. ed.1991). They do not, however, permit "every citizen to become a law unto himself," *Reynolds v. United States*, 98 U.S. at 167, and they do not require the government to conduct its affairs in ways that comport with the religious beliefs of particular citizens. *Bowen v. Roy*, 476 U.S. at 699, 106 S.Ct. at 2152. Government simply could not operate if it were required to satisfy every citizen's religious needs and desires. *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 452,

108 S.Ct. 1319, 1327, 99 L.Ed.2d 534 (1988).

■■■■ Claims based on religious convictions or rights of conscience do not automatically entitle persons to establish unilaterally the terms and conditions of their relations with the government. *Bowen v. Roy*, 476 U.S. at 702, 106 S.Ct. at 2153. For the past fifty years, the courts have consistently declined to mechanically subordinate society's interests to individual religious conscience. To do so would be to make individual religious beliefs superior to the law of the land, *Reynolds v. United States*, 98 U.S. at 166–67, and would thereby destroy the rule of law on which our pluralistic society is based. *Developments in the Law—Religion and the State*, 100 Harv.L.Rev. 1606, 1704 (1987). Neither the federal nor the state constitutions give individuals a veto power over government actions that do not prohibit the free exercise of religion. *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. at 452, 108 S.Ct. at 1327.

■■■■ Recognizing that religiously motivated conduct may, in proper circumstances, be subordinated to the common good does not mean that government actions are free from constitutional constraint. The government cannot enact laws that have no purpose other than to prohibit particular religious practices unless these laws are justified by a compelling interest and are narrowly tailored to advance that interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 113 S.Ct. 2217, 2227, 124 L.Ed.2d 472 (1993). Likewise, the government cannot enact laws that discriminate against some or all religious beliefs or that regulate or prohibit conduct simply because it is undertaken for religious reasons. *Braunfeld v. Brown*, 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1961); *Fowler v. Rhode Island*, 345 U.S.

67, 69–70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953). Finally, the government cannot interpret, apply, or enforce facially neutral laws in a discriminatory manner. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. at 533–34, 113 S.Ct. at 2227.

■■■■ Government may, however, enact and enforce facially neutral and uniformly applicable laws that have the incidental effect of burdening a religious practice. When this sort of law faces a free exercise challenge, the government is not required to justify it with a compelling governmental interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. at 531, 113 S.Ct. at 2226; *Kickapoo Traditional Tribe of Tex. v. Chacon*, 46 F.Supp.2d at 653; *Decker v. Carroll Academy*, No. 02A01–9709–CV–00242, 1999 WL 332705, at *5 (Tenn.Ct.App. May 26, 1999) (No Tenn.R.App.P. 11 application filed). The enforcement of a facially neutral and uniformly applicable law that only incidentally burdens religious practice will be upheld if the government demonstrates that the law is a reasonable means for promoting a legitimate public interest. *Bowen v. Roy*, 476 U.S. at 707–08, 106 S.Ct. at 2156.

### C.

■■■ It is not our prerogative to inquire into the truth, validity, or reasonableness of the Native Americans' professed religious beliefs. *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. at 449, 108 S.Ct. at 1325; *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 144 n. 9, 107 S.Ct. 1046, 1051 n. 9, 94 L.Ed.2d 190 (1987). Religious beliefs need not be acceptable, logical, consistent, or comprehensible to others to merit constitutional protection. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. at 531, 113 S.Ct. at 2225; *Thomas v.*

*Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 714, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981). Nor must religious groups be numerically strong or their religious practices be consistent with prevailing views. *State ex rel. Swann v. Pack*, 527 S.W.2d at 107. Thus, for the purposes of this opinion, we accept without question the legitimacy of the Native Americans' religious beliefs and the sincerity with which they profess them.

The Native Americans themselves testified that there is no single belief or absolute religious truth among the numerous Native American tribes. There are a great number of tribes, many of which have been in existence for thousands of years, and all of which exhibit diverse forms of religious beliefs and customs. Sam D. Gill, *Native American Religions: An Introduction* 15 (1982).

Many Native Americans believe, as reflected by the witnesses testifying during the June 14, 1999 and August 5, 1999 hearings, that life is a journey that should not be interrupted.[42] Jeannie Barbour testified that "life is a journey, there isn't really a death, there is a journey that is ongoing." Medicine Bird Black Bear White Eagle, a spiritual advisor to the Native American Spiritual Alliance, explained:

> the journey is not complete because life does not end here, it's a continuing journey. It's just that our remains are here, and they go back to Mother Earth and Mother Earth claims it and turns it back into dust. And we are a part of Mother

Earth but our spirit goes on and makes a journey.

> We are from the star people. When we pass on, we make the journey back into the ... stars where we come from; that's where our ancestors are.

Native Americans also believe that the Native American human remains and related funerary objects are links between the physical world and the spiritual world.[43] They also believe that a person's spirit is released when his or her remains are disturbed and that the spirit cannot rest or resume its journey until the remains are reinterred.[44] Accordingly, Toye Heape explained that "when you disturb the dead, you interrupt the cycle of life, and that person returns back to the place that it came from, going back into the earth. And, thereby, you disturb the journey that that person's soul takes on its way to the spirit world." Marion Dunn added that the spirit of a deceased person "can't rest" when the burial site is disturbed. And when asked to explain what happened to a spirit when a burial site is disturbed, Dan Kirby testified that the

> [b]est way I could explain it in English terms, if you was going to somewheres and you were going a long way and I just snatch you back and pull you back to the beginning. You [are] just taking a journey to what you would call heaven, [and] you're just pulling them back.

Thus, Native Americans believe that disturbing Native American burial sites causes spiritual trauma to the deceased and ill-effects to the living. *Kickapoo Tra-*

**42.** Vine Deloria, *Red Earth, White Lies: Native Americans and the Myth of Scientific Fact* 191–92 (1995); Hibbert, 23 Am.Indian L.Rev. at 431.

**43.** Rebecca Tsosie, *Privileging Claims to the Past: Ancient Human Remains and Contemporary Cultural Values,* 31 Ariz. St. L.J. 583, 637 (1999).

**44.** H. Rep. No. 101–877, at 13, reprinted in 1990 U.S.C.C.A.N. 4367, 4372; Margaret B. Bowman, *The Reburial of Native American Skeletal Remains: Approaches to the Resolution of a Conflict,* 13 Harv.Env.L.Rev. 147, 148–50 (1989).

*ditional Tribe of Tex. v. Chacon*, 46 F.Supp.2d at 651; Trope & Echo–Hawk, 24 Ariz. St. L.J. at 49; Hibbert, 23 Am.Indian L.Rev. at 431–32.

### D.

■ We will now examine Tenn.Code Ann. §§ 46–4–101, –104 to determine whether they violate the religious rights of the Native Americans either on their face or as the Department seeks to apply them in this case. Our first task is to determine whether these statutes were enacted for the purpose of suppressing religion or religious conduct. We begin with the statutes' text because a minimum requirement of neutrality is that the law does not discriminate on its face. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. at 533, 113 S.Ct. at 2227. These statutes pass constitutional muster. Their operation does not depend on religious practices or on belief of any sort, and they do not discriminate among religions. They do not target any particular religious conduct or belief for disparate treatment. Accordingly, we conclude that these statutes are, on their face, neutral and equally applicable to unmarked Native American graves, Protestant cemeteries, family burial grounds, and confederate graves.

Next, we must determine whether these statutes compel Native Americans to abandon or violate their religious beliefs. Again, there is no evidence in this record that they do. These statutes do not control religious beliefs or rights of conscience. They do not require Native Americans to abandon their belief that disturbing a burial site is immoral because it causes spiritual trauma to the deceased.

Neither do these statutes penalize Native Americans for their beliefs or traditions by denying them rights or benefits available to others in the same or similar circumstances.

■ Likewise, these statutes do not prevent Native Americans from practicing their religion or from performing their traditional religious rituals. There is no evidence that the property surrounding the intersection of Hillsboro Road and Old Hickory Boulevard is a traditional sacred site for area Native Americans.[45] Nor have the Native Americans insisted that this particular site is intimately and inextricably connected with their ability to practice their religion or that relocating the human remains found at this site will doom their religion or prevent them from continuing to practice it. To the contrary, the evidence shows that Native Americans had no interest in this particular site until the human remains were inadvertently discovered. Thus, the Native Americans' complaints in this case are based, not on the intrinsic sacredness of the area surrounding the intersection of Hillsboro Road and Old Hickory Boulevard,[46] but rather on the sacredness of the human remains buried there.

Accordingly, we find that Tennessee's statutes governing the termination of burial grounds are facially neutral and uniformly applicable and that they only incidentally burden the Native Americans' religious practices and rights of conscience. Therefore, we must uphold the constitutionality of these statutes if the Department has demonstrated that they

---

**45.** Free exercise claims based on the sacredness of geographical locations were made in *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. at 442, 108 S.Ct. at 1322; *Sequoyah v. Tennessee Valley Auth.,* 620 F.2d 1159, 1160 (6th Cir.1980).

**46.** A detailed discussion of Native American beliefs regarding sacred places can be found in Rose, 7 Va. J. Soc. Pol'y & L. at 109.

are a reasonable means to promote a legitimate public interest.

Almost one hundred years ago, the Tennessee Supreme Court recognized that "the dead must give place to the living." *Memphis State Line R.R. v. Forest Hill Cemetery Co.*, 116 Tenn. at 419, 94 S.W. at 73–74. And so it is today. The continuing, inexorable growth of our populated areas has created increasing demands for convenient housing, new retail centers, and roadways to connect them. The construction required to meet these demands, like the construction of the TVA dams that displaced so many residents of Appalachia during the early twentieth century, continues to displace the living and the dead. This burden has not fallen just on Native Americans.[47]

This record contains undisputed evidence that widening Hillsboro Road between Franklin and Nashville has become necessary. The State has expended public funds to acquire property for this purpose, including the tract at the intersection of Hillsboro Road and Old Hickory Boulevard. This roadway has been sited and designed in a competent and professional manner, and the construction was well underway when these unmarked graves were discovered. Accordingly, completing this project as designed serves a legitimate public purpose.

■ Over fifty years ago, the Tennessee General Assembly balanced the competing interests of property owners and those who favored change with those who favored preserving burial grounds undisturbed. The General Assembly determined that the courts should consider these matters on a case-by-case basis and that the courts should permit governments to close burial grounds and to relocate the human remains interred there as long as the government demonstrated compliance with the four requirements in Tenn.Code Ann. § 46–4–104. We find nothing in this procedure or the possible results of the procedure that unconstitutionally interferes with Native American rights of conscience or free exercise rights protected by the First Amendment and Tenn. Const. art. I, § 3.

Our decision should not be read as countenancing governmental insensitivity to the religious beliefs of any citizen.[48] Plainly, many of the Native Americans' concerns about this project stem from past governmental disdain for their ancestors and traditional beliefs. Throughout his testimony during two days of hearings, Medicine Bird Black Bear White Eagle referred to the Native American human remains being stored in museums and the research that has been conducted on these remains and requested the repatriation of these remains. He testified that he "hear[s] their cries all the time" and that Native American remains in repositories and museums "need to be reburied into Mother Earth."[49] We respect these concerns but find nothing in the record indicating that the human remains and funer-

---

**47.** Brendan I. Koerner, *A Matter of Grave Import*, U.S. News Online (June 12, 2000) (visited July 1, 2001) <http://www.usnews.com/usnews/issue/000612/graves.htm>; Erik Tryggestab, *Family Cemetery Must Relocate For Regional Reservoir*, Online Athens (Dec. 13, 1998) (visited July 1, 2001) <http://www.onlineathens.com/1998/121398/1213.a11graves.html>.

**48.** *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. at 453, 108 S.Ct. at 1328.

**49.** One of the briefs submitted by Native American parties asserts that "[o]bviously, the removal of the very object of worship, the remains of the ancestor from the earth, stored in a cardboard box, removed to a laboratory for testing and later, at the convenience of the State, offered for reinterment is a direct, violent and obtrusive interference with and a prohibition of that religious worship."

ary objects involved in this case will meet the same fate.

Two prerequisites for obtaining judicial authorization to close a burial ground are the preparation of definite arrangements for the reinterment of the human remains and the reinterment of the remains "with due care and decency." Tenn.Code Ann. § 46–4–104. Tenn.Code Ann. § 11–6–119 supplements Tenn.Code Ann. § 46–4–104 by requiring that the reinterment conform to applicable Native American customs, and Tenn.Comp.R. & Regs. r. 0400–9–1–.01, -.02 reinforces this requirement. This record contains no evidence that either the Department or any other state agency has ignored or intends to ignore these legal obligations.[50] Accordingly, Tenn.Code Ann. § 46–4–104 provides the court with the ability to prevent inappropriate treatment of the Native American human remains and funerary objects by requiring the Department to abide by the applicable statutes and regulations governing the disposition of Native American human remains.

## V.

### THE ROLE OF THE TENNESSEE COMMISSION OF INDIAN AFFAIRS

The Department also asserts that the trial court erred by authorizing the Commission and its executive director to participate in this proceeding as "interested persons." The trial court based its decision on its belief that the statutes creating the Commission and the administrative regulations defining its authority gave the Commission a "right" in the burial grounds for the purpose of Tenn.Code Ann. § 46–4–102. We have reviewed these statutes and regulations and can find no legal or factual basis for the trial court's decision.

### A.

The Tennessee General Assembly created the Commission in 1983.[51] Rather than being a free-standing, autonomous agency, the Commission is "administered under the direction and supervision of the department of environment and conservation." Tenn.Code Ann. § 4–34–101(b). The Department of Environment and Conservation is one of the twenty-four administrative agencies of the Executive Branch of state government.[52] Tenn.Code Ann. § 4–3–101(9) (Supp.2000). The chief executive officer of the Department of Environment and Conservation is the Commissioner of Environment and Conservation who, as a gubernatorial appointee, serves on the Governor's cabinet. Tenn.Code Ann. § 4–3–111(9); Tenn.Code Ann. §§ 4–

---

**50.** We do not share the trial court's dismay over the presence of the state archeologist when the Native Americans were conducting religious rituals at the grave sites. The property belongs to the State, and the human remains, by operation of Tenn.Code Ann. § 11–6–107(d)(4), are in the custody of the state archeologist. Whatever interests the Native Americans have in conducting rituals at this site cannot divest the government of its ownership rights to this property, including the right to control access to the property and to use the property as it sees fit. *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. at 453, 108 S.Ct. at 1327. It is not at all clear that the Native Americans had proper authorization to enter the construction

site. Accordingly, the state archeologist cannot be faulted for being present to monitor their activities.

**51.** Act of May 12, 1983, ch. 425, 1983 Tenn. Pub.Acts 829, codified at Tenn.Code Ann. §§ 4–34–101, –108 (1998).

**52.** The governor is ultimately responsible for twenty of the twenty-four departments. The remaining four, the Department of Audit, the Department of State, the Department of Treasury, and the Legal Department are under the control of other constitutional officers. Tenn. Code Ann. § 4–3–111(1), (23), (24), (25) (Supp.2000).

3–112, 122(a) (1998). The Commissioner of Environment and Conservation has "charge and general supervision" over the department and its officers and employees. Tenn.Code Ann. §§ 4–3–121(a), –502 (1998).

The Commission's statutory purposes, broadly stated, are to "[d]eal fairly and effectively with Indian affairs," to "[a]ssist Indian communities in social and economic development," and to "[p]romote recognition of, and the right of Indians to pursue, cultural and religious traditions considered by them to be sacred and meaningful to Native Americans." Tenn.Code Ann. § 4–34–102(1), (5), (6). To accomplish these purposes, the General Assembly gave the Commission the power to "meet," to "investigate," to "confer with appropriate officials," to "encourage and implement coordination of applicable resources," and to "review proposed legislation." Tenn.Code Ann. § 4–34–103(1), (2), (3), (4), (7). The General Assembly also empowered the Commission to conduct public hearings on matters relating to Indian affairs, Tenn.Code Ann. § 4–34–103(8), to establish rules and procedures for officially recognizing Native American groups, tribes, and communities, Tenn.Code Ann. § 4–34–103(9), (10), and to prepare an annual report. Tenn.Code Ann. § 4–34–106.

The Commission was not mentioned in the 1990 statutes pertaining specifically to Native American human remains and funerary objects. These statutes provided that the inadvertent discovery of human remains must be reported to the Division of Archeology once the coroner or medical examiner determines that there is no forensic interest in the remains. Tenn.Code Ann. § 11–6–107(d)(3). The purpose of the notice provision was to enable the Division to assure that Native American groups could see to it that a Native American would be present on site during the excavation and removal of the remains under Tenn.Code Ann. § 11–6–116(a). In 1991, the Department of Environment and Conservation promulgated rules limiting the Native Americans entitled to be present at the site to one of the Native American members of the Archeological Advisory Commission. Thus, at this point, the Commission still had no statutory role in the closing of burial grounds or the reinterment of the human remains.

In 1999, the Tennessee General Assembly amended the statutes authorizing the closure of a burial ground to require the State Archeologist to notify not only the Native American members of the Archeological Advisory Commission but also the chair of the Commission. The General Assembly did not explicitly specify what either the Native American members of the Archeological Advisory Commission or the chair of the Commission were supposed to do with this information. Similarly, the General Assembly chose not to expand the Commission's powers.[53]

**B.**

It is a fundamental rule of law that the departments, agencies, and commissions of government have no inherent

---

**53.** We note that the Commission is one of the governmental bodies slated for termination on June 30, 2001 unless the General Assembly authorizes it to continue. Tenn.Code Ann. § 4–29–222(a)(9) (Supp.2000). The 102nd General Assembly did not reauthorize the Commission before July 1, 2001. We have determined that the demise of the Commission in its present form on July 1, 2001 does not render the question of the Commission's involvement in this case moot. Tenn.Code Ann. § 4–29–112 (1998) provides that the Commission shall continue in existence until June 30, 2002 "for the purpose of winding up its affairs." Until June 30, 2002, the Commission's "termination shall not diminish, reduce, or limit the powers or authorities of each respective governmental entity."

or common-law power of their own. *General Portland, Inc. v. Chattanooga Hamilton County Air Pollution Control Bd.*, 560 S.W.2d 910, 914 (Tenn.Ct.App.1976). They are purely creatures of statute. Accordingly, governmental agencies have only those powers expressly granted by statute and those powers required by necessary implication to enable them to fulfill their statutory mandate. *Sanifill of Tenn., Inc. v. Tennessee Solid Waste Disposal Control Bd.*, 907 S.W.2d 807, 810 (Tenn.1995); *Tennessee Pub. Serv. Comm'n v. Southern Ry.*, 554 S.W.2d 612, 613 (Tenn.1977). Actions taken by a governmental agency without the required authority are nullities. *Johnson v. Alcoholic Beverage Comm'n*, 844 S.W.2d 182, 186 (Tenn.Ct. App.1992); *Madison Loan & Thrift Co. v. Neff*, 648 S.W.2d 655, 657 (Tenn.Ct.App. 1982).

The Tennessee General Assembly has not explicitly given the Commission the authority to bring suit in its own name or to intervene in legal proceedings involving other parties.[54] Accordingly, if the Commission is to have the power to intervene in legal proceedings, the power must arise by necessary implication to enable the Commission to fulfill its statutory mandates or to carry out its statutory duties. We have concluded that intervening in pending judicial proceedings is not necessary to enable the Commission to accomplish the purposes for which it was created.

Concluding that the Commission lacks authority to intervene in pending lawsuits does not prevent the Commission from continuing to "[p]romote recognition of, and the right of Indians to pursue, cultural and religious traditions considered by them to be sacred and meaningful to Native Americans." It means only that the Commission must promote this recognition in public fora other than the courts. Likewise, it does not mean that the Commission cannot continue to study, confer, or hold hearings on matters relevant to Indian affairs. It means only that the Commission cannot engage in these activities in the context of litigation involving other parties.

■■■ The trial court's decision to give "interested person" status to the Commission and its executive director is based on two dubious interpretations of the Commission's enabling statutes. First, the trial court extrapolated the Commission's power to intervene in judicial proceedings from its power under Tenn.Code Ann. § 4–34–103(8) to "conduct public hearings."[55] There is, of course, a palpable difference between the Commission conducting administrative hearings on its own and the Commission's intervening in judicial proceedings in a court of record. The two are completely unrelated and, therefore, Tenn. Code Ann. § 4–34–103(8) does not support the trial court's decision to permit the Commission to intervene as an "interested person."

---

**54.** The General Assembly could easily have given the Commission this sort of authority because it has given similar authority to other governmental entities. *E.g.*, Tenn.Code Ann. § 4–17–406(b)(4) (1998) (Industrial Finance Corp.), Tenn.Code Ann. § 4–31–104(1) (1998) (Local Development Authorities); Tenn.Code Ann. § 7–5–107(1) (1998) (Metropolitan Governments); Tenn.Code Ann. § 7–67–109(2) (Supp.2000) (Sports Authorities); Tenn.Code Ann. § 7–82–304(1) (Supp.2000) (Utility Dis-

tricts); Tenn.Code Ann. § 42–3–108(a)(1)(A) (2000) (Airport Authorities); Tenn.Code Ann. § 49–9–209(c) (1996) (the Board of Trustees of the University of Tennessee).

**55.** The trial court noted in its June 29, 1999 "supplemental order" that "[t]his case most likely will include 'a public hearing' or trial 'on matters relating to Indian [a]ffairs.'"

Second, the trial court appears to have inferred the power to intervene in lawsuits to close a burial ground from the statute and regulation requiring the state archeologist to notify the chair of the Commission when the archeologist is informed that such a suit has been filed. Tenn.Code Ann. § 11–6–116(c); Tenn.Comp.R. & Regs. r. 0400–9–1–.04. The trial court determined that the purpose of the notice provision was "[s]o that the Commission may assert any right in or incident to burial grounds made the subject of litigation." It is one thing to interpret these provisions to give the Commission the right to timely notice of legal proceedings to close a burial ground. It is, however, quite another thing to read the right to intervene into the mere right to notice.

The trial court seems to have concluded that the only possible reason for requiring that notice be given to the chair of the Commission must be to enable the Commission to intervene as an "interested person" in the pending closure proceedings. There are, however, at least two more plausible purposes for this notice provision. First, the notice provision enables the Commission to promote the recognition of Native American religious traditions by consulting with the state archeologist and others to assure that Native American human remains removed from a closed burial ground are reinterred in accordance with the appropriate Native American traditions as required by Tenn. Code Ann. § 11–6–119. Second, the notice requirement furthers the Commission's ability to provide aid and protection to Native Americans and to prevent undue hardship by enabling the Commission to assist in locating relatives of the deceased Native Americans whose identities or whereabouts are unknown. These relatives, if located, would then have standing to claim "interested person" status in a pending closure proceeding. In light of these salutary reasons for requiring notice to the Commission, the trial court went too far when it concluded that the purpose of the notice provision must have been to enable the Commission to intervene.

The Commission's enabling statutes demonstrate that the Commission is a subordinate agency of the Department of Environment and Conservation. Rather than being simply affiliated with the department for administrative purposes,[56] Tenn. Code Ann. § 4–34–101(b) provides that the Commission is "administered under the direction and supervision of the department of environment and conservation." The plain import of this provision is that the Commission is under the direction and supervision of the Commissioner of Environment and Conservation.

In a June 23, 1999 letter to the Commission's executive director, the Commissioner of Environment and Conservation declined to authorize the Commission to intervene in this proceeding and refused

---

56. The language in Tenn.Code Ann. § 4–34–101(b) is not typically found in statutes creating other boards and commissions. In virtually every other circumstance, the General Assembly has preserved the board's or commission's independence by stating that it is "attached" to a particular department for "administrative purposes." E.g., Tenn.Code Ann. § 4–3–5003(a)(3) (1998) (Tennessee Film, Entertainment and Music Commission); Tenn.Code Ann. § 4–14–208 (1998) (Tennessee Science and Technology Advisory Council); Tenn.Code Ann. § 4–50–102(i) (1998) (Economic Council on Women); Tenn.Code Ann. § 62–18–103(b) (1997) (Board of Examiners for Land Surveyors). In other instances, the General Assembly also recites specifically that the board or commission is autonomous or independent. E.g., Tenn.Code Ann. § 2–10–203(b)(1) (Supp. 2000) (Registry of Election Finance); Tenn. Code Ann. § 9–8–301(b), (e) (1999) (Tennessee Claims Commission).

to request a special counsel to represent the Commission in this endeavor. Thus, in addition to the lack of explicit statutory authority to intervene, the head of the department with direct supervisory power over the Commission has explicitly declined to permit the Commission to intervene. The lack of authorization to proceed from its superior provides another reason for concluding that the Commission cannot intervene in this proceeding.

 Finally, one important prudential consideration supports our conclusion that the Commission should not be permitted to intervene in this proceeding. As a general matter, state agencies should not be permitted to judicially challenge the constitutionality of the conduct of other state agencies. *Star–Kist Foods, Inc. v. County of Los Angeles,* 42 Cal.3d 1, 227 Cal.Rptr. 391, 719 P.2d 987, 990–91 (1986); *Romer v. Board of County Comm'rs,* 956 P.2d 566, 573 (Colo.1998). This rule exists to avoid drawing courts into matters more properly committed to another branch of government. *Maurer v. Young Life,* 779 P.2d 1317, 1323 (Colo.1989). It is especially applicable to disputes between two executive branch agencies that ultimately must answer to a single decision-maker—the governor. Thus, in the absence of an express statutory authority, one executive branch agency does not have the authority to intervene in a pending judicial proceeding to challenge the legality or constitutionality of another executive branch agency's actions.

 A justiciable controversy can only be presented by a party with capacity and standing to litigate. *Silver v. Pataki,* 274 A.D.2d 57, 711 N.Y.S.2d 402, 404–05 (2000). Based on the record before us, we conclude, as a matter of law and fact, that the Commission lacks capacity to intervene or to otherwise participate in judicial proceedings to close a burial ground and to relocate the human remains. We also conclude that the Commission has no standing in this proceeding because, as a statutory creature, it has no rights or interests of its own entitled to constitutional protection. In addition, it has neither alleged nor demonstrated that any of its proprietary interests as a state agency are being jeopardized by this proceeding. Accordingly, we find that the trial court erred by permitting the Commission and its executive director[57] to participate in these proceedings as "interested persons."

## VI.

### THE DISQUALIFICATION OF THE ATTORNEY GENERAL AND REPORTER AND THE APPOINTMENT OF AN ATTORNEY GENERAL PRO TEM

The final issue presented by this appeal is the trial court's unprecedented decision to disqualify the Attorney General and Reporter ("Attorney General") from representing the Commission and to appoint two private lawyers to represent the Commission in this proceeding. Our decision that the Commission and its executive director are not entitled to participate in this proceeding as interested parties ordinarily would resolve this question because it obviates the Commission's need for a lawyer. However, because the two lawyers appointed by the trial court have actually provided professional services to the Commission, we must address the legality of the trial court's conduct.

---

57. It is unnecessary to analyze in detail the Commission's executive director's capacity and standing to intervene because the executive director has no authority beyond the authority granted to the Commission. Tenn. Code Ann. § 4–34–108(a). If the Commission lacks the authority to intervene, its executive director likewise lacks authority to intervene.

We have determined that the trial court's decision to appoint private lawyers to represent the Commission was erroneous for three reasons. First, the Commission did not need a lawyer because it was not entitled to participate in this proceeding. Second, the trial court erroneously interpreted and applied the Code of Professional Responsibility when it concluded that the Attorney General had a conflict of interest requiring disqualification. Third, even if the trial court had been correct regarding the Attorney General's disqualification, the trial court has no authority to appoint an Attorney General pro tem to replace the Attorney General.

### A.

The Attorney General became a constitutional officer with the adoption of the 1853 amendments to the Constitution of 1835. Tenn. Const. art. VI, § 5.[58] The Attorney General is the chief executive officer of the Legal Department of state government. Tenn.Code Ann. § 4–3–111, –1502; Tenn.Code Ann. § 8–6–102 (1993). In this role, the Attorney General has both extensive statutory power and the broad common-law powers of the office except where these powers have been limited by statute. *State v. Chastain,* 871 S.W.2d 661, 664 (Tenn.1994); *State v. Heath,* 806 S.W.2d 535, 537 (Tenn.Ct.App. 1990).

By statute, the Attorney General is responsible for "[t]he trial and direction of all civil litigated matters and administrative proceedings in which the state of Tennessee or any officer, department, agency, board, commission or instrumentality of the state may be interested." Tenn.Code Ann. § 8–6–109(b)(1) (1993). In this regard, the Attorney General "shall repre-

sent all offices, departments, agencies, boards, commissions or instrumentalities of the state now in existence or which may hereafter be created," Tenn.Code Ann. § 8–6–301(a) (1993), and shall "direct and supervise all investigations and litigation necessary to the administration of the duties of the various offices, departments, agencies, boards, commissions or instrumentalities of the state, and no such entities shall institute any civil proceeding except through the [A]ttorney [G]eneral and [R]eporter." Tenn.Code Ann. § 8–6–301(b).

In addition to the Attorney General's role as the State's principal civil litigator, the Attorney General is obligated to give the governor, secretary of state, state treasurer, comptroller of the treasury, members of the general assembly and other state officials, when called upon, legal advice and formal written opinions regarding the official discharge of their duties. Tenn.Code Ann. § 8–6–109(b)(5), (6). Thus, "[a]ll legal services required by such offices, departments, agencies, boards, commissions or instrumentalities of the state shall be rendered by, or under the direction of, the [A]ttorney [G]eneral and [R]eporter." Tenn.Code Ann. § 8–6–301(a).

### B.

■ As other courts have noted, the office of the Attorney General is a unique position. *Connecticut Comm'n on Special Revenue v. Connecticut Freedom of Info. Comm'n,* 174 Conn. 308, 387 A.2d 533, 537 (1978). As a member of the bar, the Attorney General is held to high standards of professional conduct. As a constitutional officer, the Attorney General has been entrusted with broad duties as the State's

---

**58.** The officer identified as the "Attorney General for the State" was included in the 1853 amendments to the Constitution of 1853. The name of the officer was changed to "Attorney General and Reporter" with the adoption of the Constitution of 1870.

chief civil law officer and is expected to discharge these public duties to the best of his or her abilities. As a lawyer, the Attorney General must by statute provide legal representation to all departments and agencies of state government.

 The Code of Professional Responsibility contains no specific exemptions for the Attorney General and his or her assistants. Therefore, as a lawyer and officer of the court, the Attorney General is subject to the Code of Professional Responsibility. *Chun v. Board of Trustees of Employees' Retirement Sys.*, 87 Hawai'i 152, 952 P.2d 1215, 1237 (1998); *Attorney General v. Michigan Pub. Serv. Comm'n*, 243 Mich.App. 487, 625 N.W.2d 16, 27 (2001); *Manchin v. Browning*, 170 W.Va. 779, 296 S.E.2d 909, 920 (1982). There is, however, a need for studied application and adaptation of the ethics rules in the Code of Professional Responsibility to the Attorney General and his or her staff in recognition of the uniqueness of the office, the Attorney General's obligation to protect the public interest, and the Attorney General's statutory obligation to represent the various and sometimes conflicting interests of numerous state agencies. *Chun v. Board of Trustees of Employees' Retirement Sys.*, 952 P.2d at 1236; *Attorney General v. Michigan Pub. Serv. Comm'n*, 625 N.W.2d at 28.

 By statute, the General Assembly has mandated a relationship akin to the traditional attorney-client relationship between the Attorney General and the state officials and agencies the Attorney General represents. *Attorney General v. Michigan Pub. Serv. Comm'n*, 625 N.W.2d at 27; *Manchin v. Browning*, 296 S.E.2d at 920. Thus, the Attorney General owes a duty of undivided loyalty to his or her clients and must exercise the utmost good faith to protect their interests. *Alexander v. Inman*, 974 S.W.2d 689, 693–94 (Tenn.1998).

The Attorney General must (1) preserve client confidences to the extent public clients are permitted confidences, (2) exercise independent judgment on his or her client's behalf, and (3) represent his or her clients zealously within the bounds of the law. Tenn.S.Ct.R. 8, Canons 4, 5, & 7.

 Unlike the conflict-of-interest rules governing the conduct of lawyers representing private clients, the Attorney General is not necessarily prohibited from representing governmental clients whose interests may be adverse to each other. The majority rule is that the Attorney General, through his or her assistants, may represent adverse state agencies in intra-governmental disputes. *Chun v. Board of Trustees of Employees' Retirement Sys.*, 952 P.2d at 1237; *Attorney General v. Michigan Pub. Serv. Comm'n*, 625 N.W.2d at 29–30; *State ex rel. Allain v. Mississippi Pub. Serv. Comm'n*, 418 So.2d 779, 783 (Miss.1982). This rule applies, however, only when the Attorney General is not an actual party to the litigation. *Connecticut Comm'n on Special Revenue v. Connecticut Freedom of Info. Comm'n*, 387 A.2d at 537; *Environmental Protection Agency v. Pollution Control Bd.*, 69 Ill.2d 394, 14 Ill.Dec. 245, 372 N.E.2d 50, 53 (1977); *Superintendent of Ins. v. Attorney General*, 558 A.2d 1197, 1202–04 (Me.1989); *Attorney General v. Michigan Pub. Serv. Comm'n*, 625 N.W.2d at 30. When the Attorney General is an actual party to the litigation, independent counsel should be appointed for the state agency in order to remedy the ethical impediment to the Attorney General's position as a party. *See Arizona State Land Dep't v. McFate*, 87 Ariz. 139, 348 P.2d 912, 915 (1960); *Attorney General v. Michigan Pub. Serv. Comm'n*, 625 N.W.2d at 31; *City of York v. Pennsylvania Pub. Util. Comm'n*, 449 Pa. 136, 295 A.2d 825, 833 (1972).

## C.

The trial court decided to disqualify the Attorney General from representing the Commission in this proceeding because it believed there was a "conflict of interest" between the Department of Transportation and the Commission. Because the Attorney General has a specific statutory obligation to represent the Department in condemnation proceedings,[59] the trial court apparently reasoned that the Attorney General somehow owed a greater duty of loyalty to the Department than to the Commission. This conclusion is not well-founded.

In addition to the general duty of the Attorney General to represent all state offices, departments, and agencies, Tenn. Code Ann. § 8–6–301(a), the Attorney General must perform all such other duties as may devolve upon him or her by law. Tenn.Code Ann. § 8–6–109(b)(14). Throughout the years, the General Assembly has frequently added to the Attorney General's duties and responsibilities. It is not uncommon for the General Assembly to instruct the Attorney General to provide legal advice and representation to specific governmental entities.[60] Thus, the Attorney General's specific statutory responsibility to represent the Department in condemnation matters is not unique and does not have the significance the trial court attached to it. The Attorney General owes the same duty of loyalty and professionalism to the Commission that he or she owes to the Department.

■ If the Commission were entitled to participate in this proceeding as an "interested person," we perceive no basis for preventing the Attorney General's assistants from representing both the Department and the Commission. The Attorney General himself is not a party to these proceedings, and therefore, his assistants could have appropriately represented both the Department and the Commission even though their interests were adverse. Accordingly, the trial court erred by concluding that the Code of Professional Responsibility required the disqualification of the Attorney General.

## D.

■ Even if the circumstances of this case required the Attorney General's disqualification, which they do not, the trial court plainly exceeded its authority by undertaking to appoint two private lawyers to represent the Commission in this proceeding. The power to appoint district attorneys general pro tempore in Tenn. Const. art. VI, § 5 does not, by its plain terms,[61] apply to the state Attorney Gener-

---

**59.** Tenn.Code Ann. § 54–5–105 (1998).

**60.** *E.g.,* Tenn.Code Ann. § 2–10–109(a)(1) (1994) (county election commissions, primary boards, and registrars at large); Tenn.Code Ann. § 2–10–109(a)(3) (Registry of Election Finance); Tenn.Code Ann. § 3–10–105(b) (Supp.2000) (Office of Legislative Services, Office of Legal Services, Office of Legislative Administration, and Office of Management Information); Tenn.Code Ann. § 4–15–101(b) (1998) (Building Commission); Tenn.Code Ann. § 8–7–301 (1993) (District Attorneys General Conference); Tenn.Code Ann. § 8–34–308(a) (1993) (Board of Trustees of the Tennessee Consolidated Retirement System); Tenn.Code Ann. § 12–1–108 (1999) (Depart-

ment of General Services in condemnation matters other than for roads); Tenn.Code Ann. § 49–50–702 (1996) (Goodwyn Institute); Tenn.Code Ann. § 50–3–905 (1999) (OSHA violations); Tenn.Code Ann. § 62–6–114 (Supp.2000) (Board of Accountancy); Tenn.Code Ann. § 62–13–203(d) (1997) (Real Estate Commission); Tenn.Code Ann. § 62–19–105(b) (1997) (Tennessee Auctioneers Commission); Tenn.Code Ann. § 62–26–303(d) (1997) (Private Investigation Commission); Tenn.Code Ann. § 63–9–111(f) (Supp. 2000) (Board of Osteopathic Examination).

**61.** Tenn. Const. art. VI, § 5 states, in part, that: "In all cases where the *Attorney for any district* fails or refuses to attend and prosecute

al. Thus, Tenn. Const. art. VI, § 5 provides no justification for the trial court's action, and the trial court's reliance on *Goddard v. Sevier County*, 623 S.W.2d 917 (Tenn.1981) is clearly misplaced.

In light of the constitutional stature and statutory duties of the Attorney General, we decline to impute to the courts an implied power to appoint lawyers to represent officers and agencies of state government. There are three well-defined procedures for obtaining a lawyer to represent a state officer or agency—two of which are plainly inapplicable in circumstances where the Attorney General cannot represent a state officer or agency because of a conflict of interest.[62] In circumstances involving a conflict of interest due to the Attorney General's personal involvement in a case, Tenn.Code Ann. § 8–6–106 (1993) provides:

> In all cases where the interest of the state requires, in the judgment of the governor and attorney general and reporter, additional counsel to the attorney general and reporter or district attorney general, the governor shall employ such counsel, who shall be paid such compensation for services as the governor, secretary of state, and attorney general and reporter may deem just, the same to be paid out of any money in the treasury not otherwise appropriated, upon the certificate of such officers certifying the amount to the commissioner of finance and administration.

Thus, the governor, with the Attorney General's concurrence, may retain additional counsel in all circumstances where the governor and the Attorney General jointly determine that the interests of the state require additional counsel.

 The trial court appears to have devalued this statutory procedure because of its belief that the Attorney General would not exercise his authority under Tenn.Code Ann. § 8–6–106 in a responsible and professional manner. However, the courts must always presume that public officials, including the Attorney General, will discharge their duties in good faith and in accordance with the law. *Mitchell v. Garrett*, 510 S.W.2d 894, 898 (Tenn. 1974); *Reeder v. Holt*, 220 Tenn. 428, 435–36, 418 S.W.2d 249, 252 (1967); *421 Corp. v. Metropolitan Gov't*, 36 S.W.3d 469, 480 (Tenn.Ct.App.2000). The Attorney General is an officer of the court and has the statutory responsibility to assure that the various departments of state government receive appropriate legal representation when they are entitled to it. Were a circumstance to arise that prevented the Attorney General from representing a state office or agency in a civil legal proceeding, we presume that the Attorney General would act professionally, ethically, and in good faith and would exercise his or her discretion under Tenn.Code Ann. § 8–6–106 to authorize the governor to employ additional counsel to represent the office or agency entitled to representation.

The trial court attaches great significance to the fact that the Solicitor General, on the Attorney General's behalf, informed the court that the Attorney General did not intend to certify the need for appointing additional counsel to represent the Commission in this proceeding. However, as we have already determined, the Attor-

according to law, the Court shall have the power to appoint an Attorney pro tempore." [emphasis added].

**62.** The two procedures not applicable here are removing the Attorney General by im-

peachment under Tenn. Const. art. VI, § 6 and retaining special counsel to defend the constitutionality of a state statute that the Attorney General has declined to defend. Tenn.Code Ann. § 8–6–109(e).

ney General's position in this case was legally sound because the Commission and its executive director were not entitled to participate in the proceeding as "interested parties." Because they were not entitled to participate in the case, they had no need for a lawyer to represent them. Thus, on the face of the record, the Attorney General did not abuse his discretion by declining to accede to the Commission's request for the appointment of special counsel at the taxpayers' expense to represent the Commission in this proceeding.

■■■ The law on this matter is crystal clear. Nonetheless, the trial court appointed an "attorney general pro tem" and a second lawyer to act as "Second Chair" to the Attorney General pro tem. These lawyers, acting pursuant to the trial court's mandate, have undertaken to provide legal services to the Commission both at trial and on appeal and have provided competent representation in this proceeding. However, notwithstanding these lawyers' skill and diligence, their appointment was plainly void ab initio because it was without legal authority.

Because their appointments are void, we vacate the trial court's order appointing an Attorney General pro tem and the "Second Chair" to the Attorney General pro tem. The law provides no basis for compensating these lawyers for their efforts in this matter. Accordingly, we thank them for their willingness to accept the trial court's appointment and discharge them from any further responsibility to represent either the Commission or its executive director in this proceeding.

### VII.

In conclusion, we reverse the decision authorizing the fifteen individual Native Americans, the Commission of Indian Affairs, and the Commission's executive director to participate in this proceeding as "interested persons" under Tenn.Code Ann. § 46–4–102. Likewise, we reverse and vacate the order disqualifying the Attorney General and Reporter from representing the Commission of Indian Affairs and appointing an Attorney General pro tem and a "Second Chair" to the Attorney General pro tem. We remand this case to the trial court for further proceedings in strict compliance with this opinion. In accordance with Tenn.R.App.P. 42(a) we direct that the mandate be issued thirty days after the filing of this opinion unless stayed by the Tennessee Supreme Court. We tax the costs of this appeal, jointly and severally, to the fifteen individual Native Americans who sought to intervene in this proceeding as "interested persons" under Tenn.Code Ann. § 46–4–102, for which execution, if necessary, may issue.